IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JERRY L. RAY,

               Plaintiff,                                 CIVIL ACTION

v.                                              CV13-01483-DSC

MICHAEL CAIN; an Individual,
JAMES MARKLEY, an Individual;
and CITY OF WASHINGTON

               Defendants.

**JURY TRIAL DEMANDED**

## PLAINTIFF'S PRETRIAL STATEMENT AND WITNESS LIST

       Plaintiff, by undersigned counsel, files this Pre-Trial Statement and Witness List as follows:

## I. WITNESSES - LIABILITY

1.     **Jerry Ray**
       **133 Wabash Street**
       **Pittsburgh, PA 15220**

**Proffer:**  Plaintiff is mostly amnestic to the events of the incident, however, he will offer limited testimony in that regard. He will also testify in detail and at length about his subsequent medical condition, injuries and damages.

2.     **Officer James Markley**
       **City of Washington Police Department**

**Proffer:**  Defendant Markley will be called on cross in Plaintiff's case in chief. It is believed Defendant Markley will testify about his activity prior to, during and after Plaintiff was in custody. Defendant will have the opportunity to offer his version of events and whether he had a reasonable belief, under the totality of the circumstances, for using force against Plaintiff after he had fallen onto the roadway while allegedly visibly intoxicated; whether his own conduct created a danger that otherwise would not have existed; and whether his acts or failures to act represent a manifest failure to train police by the City of Washington. Defendant will also testify whether he conducted

himself prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures.

3.    **Officer Michael Cain**
      **City of Washington Police Department**

**Proffer:**   Defendant Cain will be called on cross in Plaintiff's case in chief. When called, it is believed Defendant Cain will testify about his activity prior to, during and after Plaintiff was in custody. Defendant will have the opportunity to offer his version of events and whether he had a reasonable belief, under the totality of the circumstances, for using force against Plaintiff after he had fallen onto the roadway while allegedly visibly intoxicated; whether his own conduct created a danger that otherwise would not have existed; and whether his acts or failures to act represent a manifest failure to train police by the City of Washington. Defendant will also testify whether he conducted himself prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures.

4.    **Detective Daniel Stanek**
      **City of Washington Police Department**

**Proffer:**   It is believed Detective Stanek will testify to the following, including but not limited to, police response after Jerry Ray was in custody; officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene photographs; and whether he and his officers conducted themselves prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures. In addition, as officer in charge of the scene, Detective Stanek will testify regarding any and all interviews of officers involved, and the police department's response to the incident.

5.    **Chief John Yancosek**
      **City of Washington Police Department**

**Proffer:**   It is believed Chief Yancosek will testify to the following, including, but not limited to, police response after Jerry Ray was in custody, officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene

photographs; and whether he and his officers conducted themselves prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures. In addition, as Officer Markley and Officer Cain's supervising Officer, he will testify regarding any and all interviews of officers involved, and the police department's response to the incident.

6.    **Captain Robert Wilson**
      **City of Washington Police Department**

**Proffer:**   As the City of Washington Police Department's second in command, it is believed Captain Wilson will testify to the following, including but not limited to, police response after Jerry Ray was in custody, officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene photographs; and whether he and his officers conducted themselves prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures.

7.    **Sergeant Michael Sulerud**
      **City of Washington City Department**

**Proffer:**   It is believed Sergeant Sulerud will testify to the following, including but not limited to, whether he was at the scene prior to Jerry Ray being run-over; police response after Jerry Ray was in custody, officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene photographs; and whether he and his officers conducted themselves prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures. In addition, he will testify in regard to his observations once on scene.

8.    **Former Chief Roger Blyth**
      **City of Washington Police Department**

**Proffer:**   As the Chief at the time of the incident, it is expected that he is going to testify as to the following, including but not limited to, officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene photographs; and whether he and his officers conducted themselves prior to, on the night of and/or

post-incident, in conformity with department training, policies and procedures. He will also testify about police department response to this incident, and police relationship with the Fraternal Order of Police. In addition, he will testify to the reasonableness of Officers Cain and Markley's actions or failures to act on the night of the incident.

9. **Chief Chris Lupinno**
   **City of Washington Police**

**Proffer:** As a subsequent police chief following this incident, it is expected that he is going to testify as to the following, including but not limited to, officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene photographs; and whether he and his officers conducted themselves prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures. He will also testify about police department response to this incident, and police relationship with the Fraternal Order of Police. In addition, he will testify to the reasonableness of Officers Cain and Markley's actions or failures to act on the night of the incident. In addition, he will testify to the changes, if any, to police procedures and training.

10. **Lieutenant Roger Lemons**
    **City of Washington Police**

**Proffer:** It is believed Lt. Lemons will testify to the following, including but not limited to, police response after Jerry Ray was in custody, officer training and its relation to officer conduct throughout the incident; use and purpose of the police manual; chain of custody for evidence; scene photographs; and whether he and his officer's conducted themselves prior to, on the night of and/or post-incident, in conformity with department training, policies and procedures.

11. **Mayor Brenda Davis**
    **City of Washington**

**Proffer:** Mayor Davis is the Official Representative of the City of Washington. She is expected to testify to the contents and answers of all Interrogatories. Furthermore, she will testify to her interaction and relationship with the police department as Mayor. It is expected that she will testify

to a police culture that resisted change and did not conduct police business in compliance with policies and procedures.

12.    **Former Mayor Anthony Spossey**
       **City of Washington**

**Proffer:**   Former Mayor Anthony Spossey was the Mayor at the time of this incident. He is expected to testify that he didn't learn about this incident until he was served a subpoena to testify in 2015, and, as such, did no investigations or interviews in connection with this incident. Further, it is believed he will testify that he was either unable, or unwilling, to provide oversight of the police department.

13.    **James Risbin**
       **740 Michigan Avenue**
       **Apt. L-3**
       **Washington, PA 15301**

**Proffer:**   James Risbin was the motorist that ran-over Jerry Ray while he was lying unprotected in the roadway in police custody. It is believed that Mr. Risbin will testify that there were multiple police units at the scene prior to the collision. It is further believed that he will testify that the collision occurred at a different location and lane of travel as propounded by police. Finally, he will testify about the outcome of his criminal case in connection with this instant claim.

14.    **Matthew Day**
       **Ambulance & Chair**

**Proffer:**   Matthew Day was a first responder called to the scene at the time of this incident. It is expected that he will testify as to his firsthand knowledge as to Plaintiff's injuries and his own interactions with others at the scene.

15.    **Stephen Colecchi**
       **State MedEvac**

**Proffer:**   Stephen Colecchi was a first responder called to the scene at the time of this incident. It is expected that he will testify as to his firsthand knowledge as to Plaintiff's injuries and his own interactions with others at the scene.

16.      **Jared Jenkins**
         **City of Washington**

**Proffer:**    Jared Jenkins is the 911 supervisor for the City and County of Washington. It is expected

that Mr. Jenkins will testify as to the relevant timeline and call record in connection with this action.

He will provide detailed testimony regarding the entries, the abbreviations and the identifications

of the different inputs on the timeline.

17.      **Chuck Drago**
         **Drago Professional Consultants LLC**
         **P.O. Box 623511**
         **Oviedo, Florida 32762-3511**

**Proffer:**    Chuck Drago is an expert on police procedures and conduct, including, but not limited

to, training, policies and procedures, and the reasonableness of officers' actions on the night of the

incident under the totality of the circumstances. It is expected Mr. Drago will testify that Officers'

Markley and Cain created a danger that otherwise would not have existed; used excessive force;

and, that the City of Washington manifestly failed to train its officers in conformity with the

standard of care.

Mr. Drago will offer these opinions pursuant to his report, attached hereto.

18.      **Michael J. McCabe, Jr., Ph.D., DABT, ATS**
         **Robson Forensic, Inc.**
         **354 North Prince Street**
         **Lancaster, PA 17603**

**Proffer**:    Dr. McCabe is a toxicologist. It is expected that he will testify regarding whether it is

more probable than not, that Plaintiff's alleged conduct on the night of the incident, was in

conformity with his blood alcohol content. Likewise, he will offer testimony regarding Mr. Risbin's

judgment and perceptions based upon his blood alcohol content.

Dr. McCabe will offer these opinions pursuant to his report, attached hereto.

## II. WITNESSES – DAMAGE

1.      **Jerry Ray**
        **133 Wabash Street**
        **Pittsburgh, PA 15220**

**Proffer:**   See proffer for Plaintiff posted above.

2.      **Barbara Ray**
        **133 Wabash Street**
        **Pittsburgh, PA 15220**

**Proffer:**   Barbara Ray is Jerry Ray's mother. It is expected that Ms. Ray will testify that Jerry suffered mental and physical injuries as a result of this incident. Since the incident, he continues to suffer from anger problems, memory problems, low back pain and problems walking. It is expected that she will testify that these are clear changes in Jerry's physical and mental condition.

3.      **James M. Russavage, DMD, MD**
        **Scaife Hall, 6B**
        **3550 Terrace Street**
        **Pittsburgh, PA 15261**

**Proffer:**   Dr. Russavage is a board certified plastic and reconstructive surgeon. Dr. Russavage will testify as to Mr. Ray's injuries related to this incident, medical treatment, chronicity of Mr. Ray's ongoing complaints and medical expenses.

Dr. Russavage will offer these opinions pursuant to his report, attached hereto.

4.      **Dr. Bruce Wright**
        **110 Ft. Couch Road, Suite 5**
        **Pittsburgh, PA 15241**

**Proffer:**   Dr. Wright is a board certified psychiatrist who examined Plaintiff. It is expected that Dr. Wright will testify about Mr. Ray's post-concussive syndrome, and cognitive deficits as a result of this injury. Dr. Wright will testify that he conducted a complete cognitive examination, and made findings to a reasonable degree of psychiatric certainty as to Mr. Ray's cognitive impairments and chronicity of the symptoms associated with the post-concussive syndrome.

Dr. Wright will offer these opinions pursuant to his report, attached hereto.

5.      **Stephen Colecchi**
           **State MedEvac**

**Proffer:**    See proffer for Stephen Colecchi posted above.

6.      **Matthew Day**
           **Ambulance & Chair**

**Proffer:**    See proffer for Matthew Day posted above.

## III. EXHIBITS

**Plaintiff Expects to Offer**

1.    Photographs of Mr. Risbin's vehicle.

2.    Photographs of the intersection.

3.    Aerial views taken from Google Earth of the intersection.

4.    Photographs of Jerry Ray and his injuries.

5.    Any and all photographs.

6.    911 call log and event time line.

7.    Plaintiff's Interrogatories and Requests for Production of Documents Directed to Defendants, including responses.

8.    Plaintiff's Answers to defendants Interrogatories and Request for Production of Documents.

9.    Plaintiff's Requests for Admissions, including responses.

10.   Disclosures of Defendants.

11.   Disclosures of Plaintiff.

12.   Pleadings of Plaintiff.

13.   Pleadings of Defendant.

14.   Documents produced by the City of Washington Police Department.

15.   City of Washington Police narrative report of Officer Markley (handwritten and typed).

16.   City of Washington Police narrative report of Officer Cain (handwritten only).

17.   Police Crash Reporting Form, and all addendums thereto.

18.   Personnel file of Officer Markley.

19.  Personnel file of Officer Cain.

20.  Allegheny County criminal docket of James Risbin.

21.  City of Washington Police Department Policy & Procedure Manual.

22.  All of Plaintiff's medical records.

23.  Deposition transcript of Jerry Ray.

24.  Deposition transcript of Officer James Markley.

25.  Deposition transcript Officer Cain.

26.  Deposition transcript of Detective Daniel Stanek.

27.  Deposition transcript of Chief John Yancosek.

28.  Deposition transcript of Captain Robert Wilson.

29.  Deposition transcript of Sergeant Michael Sulerud.

30.  Deposition transcript of Roger Blythe.

31.  Deposition transcript of Chief Chris Lupinno.

32.  Deposition transcript of Lieutenant Roger Lemons.

33.  Deposition transcript of Mayor Brenda Davis.

34.  Deposition transcript of Anthony Spossey.

35.  Deposition transcript of James Risbin.

36.  Deposition transcript of Matthew Day.

37.  Deposition transcript of Stephen Colecchi.

38.  Deposition transcript of Kenneth Bollinger.

39.  Life Flight trip sheet.

40.  Ambulance & Chair trip sheet.

41.  Detective Stanek's report.

42.  PA Statute, Title 75, Section 3735.1, DUI – Aggravated Assault by Vehicle While Driving Under the Influence.

43.  Observer Reporter article regarding Lemons stepping down as Chief of Police.

44. Gizmodo.com article regarding City of Washington investigation of a murder scene that was really a movie set.

45. FOP Observer Reporter article regarding police advisory board dated 9/1/09.

46. Title 8, Section 1123.1; Mayor's Powers Concerning Police.

47. Title 8, Section 10A 07; Duties of Mayor.

48. Observer Reporter News Article regarding retirement sudden retirement of Chief Wilson.

49. Tribune Review Article dated 4/30/2013; Mayor Davis dealing with a revolving door with the Police Chiefs.

50. Police report drawing from Initial Crime Report, marked by Defendant Markley.

51. Photographs marked by Defendant Markley.

52. Photographs marked by Sergeant Michael Sulerud.

53. Any and all exhibits listed in depositions.

54. Incident report of City of Washington Police.

55. MPOETC letter from Executive director of MPOETC dated 3/13/11.

56. Newspaper article from Observer Reporter dated 10/18/11 regarding the subject matter.

57. Drawing of intersection marked by Defendant Cain.

58. Google Earth photograph marked by Defendant Cain.

59. Arrest procedure, Non-Traffic Citations, from the Policy & Procedure Manual.

60. Arrest procedure, Special Situations, from the Policy & Procedure Manual.

61. Intoxicated Individuals, from the Policy & Procedure Manual.

62. Safety Committee, from the Policy & Procedure Manual.

63. Stun Devices, from the Policy & Procedure Manual.

64. Annual Officer Evaluation Report from the Policy & Procedure Manual.

65. Photographs marked by Defendant Cain of the intersection of the incident.

66. James Risbin personnel file.

**IV. NARRATIVE STATEMENT**

On October 16, 2011, at approximately 2:14 am, City of Washington Police Officers, James Markley and Michael Cain, allege that, while on routine patrol in their marked police vehicle they observed Plaintiff, Jerry Ray, laying in the southwest lanes of Jefferson Avenue near the intersection with West Chestnut Street. It is undisputed this intersection is one of the biggest and busiest intersections within city limits, making an immediate police response a necessity. In fact, Officer Markley testified that as he drove east toward the intersection, he observed at least two (2) other vehicles in front of him turn right onto the southbound lanes of Jefferson Avenue and drive around Plaintiff.

According to Markley and Cain, they parked their police vehicle on West Chestnut Street just shy of the southbound lanes of Jefferson Avenue and activated their emergency lights. Despite a fundamental police procedure and practice of using the police vehicle to block traffic and protect the scene, both officers admit, inexplicably, they did not employ this technique. Markley and Cain described approaching the scene on-foot and noted no visible sign of injury to Plaintiff. The Officers testified to physically prodding and commanding Plaintiff to stand-up and get out of the roadway. Plaintiff apparently responded promptly to this police interaction and arose. Here, despite having every reason to immediately detain Plaintiff, the officers admit, they did not do so. Instead, Plaintiff was left to stagger away, in a northeasterly direction, away from the sidewalk and toward the middle of the intersection. The Officers, individually and contemporaneously assessed Plaintiff as exhibiting signs of visible intoxication.

As Plaintiff allegedly staggered away, Officer Markley testified that he gave verbal commands for Plaintiff to stop. In response, Plaintiff turned and acknowledged the Officers, but turned back and continued toward the middle of the intersection. The Officers affirmed that police training and experience dictate that a visibly intoxicated person not be allowed to wander into an intersection; yet, Plaintiff was not detained. As the scene progressed near the middle of the

intersection, Officer Markley testified that Plaintiff began to make furtive movements toward his waistline. Officer Cain had no specific recollection of perceiving such movements.

Based upon his observations, Officer Markley believed Plaintiff might be reaching for a gun. In response to this alleged threat of harm, Markley drew his stun device ("Taser"). It is beyond peradventure that Markley's action of drawing his Taser was a direct contravention of City of Washington Police training and its continuum of force policy, which mandates that a Taser shall not be deployed in response to a knife or gun. Officer Markley also claimed this suspicious conduct caused him to follow Plaintiff at a distance from the middle of the intersection until he reached the northeast corner.

As the event neared the northeast corner of the intersection, Officer Markley gave Plaintiff commands to stop and go to the ground. In response, Plaintiff allegedly turned around, and once more, faced the Officers. It appeared to Officer Markley that Plaintiff was attempting to comply; however, he suddenly lost balance, fell backward into a light pole, bounded forward, then fell to the sidewalk and rolled out onto the northbound lane of Jefferson Avenue. Officer Markley testified that upon reaching Plaintiff, he observed him holding a cellphone. The cellphone was seized, and as Plaintiff lay on the roadway, he was placed in handcuffs by Officer Markley, without resistance. Irreconcilably, despite allegedly believing Plaintiff may be armed with a gun, Officer Markley never searched for a weapon.

City of Washington Police that were deposed in this matter all agreed, unequivocally, they have an affirmative duty to protect a person while in police custody. They further agreed there was a foreseeable risk of harm from oncoming traffic so long as they were in the roadway. Yet, at deposition, the Markley and Cain admitted making a conscious decision *not* to immediately remove Plaintiff from the roadway, both before or after handcuffs were applied. Instead, Officer Markley directed Officer Cain to remove his flashlight and activate the strobe feature so he could warn and/or redirect oncoming traffic. Officer Cain complied.

Subsequently, Officer Cain either was instructed by Officer Markley or, unilaterally decided to abandon his post using the strobe light in favor of retrieving the police vehicle, which was located at the opposite end of the intersection. The Officers believed recovering the police vehicle to block the scene was the most reasonable course of action and in accordance with training procedures. Unfortunately, during this interim period, rather than take-up Officer Cain's position blocking the roadway and using his own strobe light, Officer Markley elected to stand over Plaintiff and endeavor to instruct him on how to stand even though he was immobilized by handcuffs and visibly intoxicated.

Concurrently, off-duty State Correctional Institute Officer, James Risbin was driving his personal vehicle northbound on Jefferson Avenue and approaching the scene. Mr. Risbin finished work earlier that night, stopped at a local pub, and was now driving intoxicated. As Mr. Risbin neared the intersection, he was distracted by the emergency lights from two (2) different police vehicles; one on the east side of West Chestnut near the southbound lanes of Jefferson Avenue, and another on his right, on the west side of West Chestnut adjacent the northbound lanes of Jefferson Avenue.

Mr. Risbin testified the police emergency lights gathered his complete attention, and as he drove through the intersection he first looked to his right, and then left. When his gaze returned to the road ahead, Mr. Risbin, traveling in the left lane, witnessed a police officer attempting to drag Plaintiff toward the right travel lane. Mr. Risbin testified the impact with Plaintiff happened almost instantaneously after his eyes returned to the road ahead.

Through his testimony, Mr. Risbin offered three (3) important observations: (1) the point of impact with Plaintiff was approximately twenty (20) to twenty-five (25) yards past the northeast corner of the intersection; (2) he unmistakably observed two (2) police vehicles on opposite sides of the intersection as he passed through it; and (3) his vehicle was in the left lane of travel at the time of impact. Significantly, these facts directly conflict with the only other known witnesses of the event: City of Washington Police, who claim: (1) the incident occurred at or near the northeast

corner of the intersection; (2) the point of impact was in the right or curb lane of travel; and (3) Officers Markley and Cain were the only police on scene at the time of the accident.

Of particular import, the Officers testified of twice attempting to reach the Washington County 911 Emergency Call Center earlier in the incident, but without success. Markley and Cain stated that when Plaintiff was finally in their custody in the northeast corner of the intersection, they were able to contact the call center and advise of their location and involvement with an intoxicated person. This is a critical fact, because record evidence from the event timeline produced by the Washington County 911 Emergency Call Center pursuant subpoena, provides quantifiable and undisputed evidence regarding the timing of specific events during the incident. The timeline entries were explained in detail, at deposition, by call center manager, Ken Bollinger.

For instance, although Markley and Cain recorded on police reports the entire event started at 2:14 a.m., the 911 event timeline shows that, at 2:14:51 a.m., the Officers reached the call center for the first time. Further, Markley and Cain both confirmed that the first contact with the 911 call center came after Plaintiff was detained in the northeast corner of the intersection. As such, there is an undefined amount of time and quantifiable information that precedes the Officers' first contact with the 911 call center; and, as to any information regarding Markley and Cain's initial contact with Plaintiff in the southwest corner of the intersection.

The next significant timeline event occurs at 2:16:46 a.m., when City of Washington Police Officer, Sergeant Michael Sulerud, advised the call center he was on scene at the intersection of Jefferson Avenue and West Chestnut Street. This evidence was further corroborated by Mr. Risbin, who testified he observed two (2) police cars on opposite sides of the intersection as he drove through it. Of note, despite this direct evidence of his presence at the scene, Sgt. Sulerud expressly denied that he was at the intersection on or before the time of the accident.

The event timeline also shows that forty (40) seconds after Sgt. Sulerud's initial transmission, at 2:17:26 a.m., the call center received an emergent request (caller unidentified) for EMS and helicopter; and, fourteen (14) seconds later, at 2:17:40, another transmission that a vehicle

hit an intoxicated person. In sum, the event timeline shows, unequivocally, police held Plaintiff in their custody, immobilized by handcuffs, laying on Jefferson Avenue, exposed to a serious risk of harm from, 2:14:51 a.m. to 2:17:26 a.m., approximately three minutes and thirty seconds (3:30:00).

Based upon their conduct over this time frame, it is clear the scene appeared innocuous to Markley and Cain until, foreseeably, a motorist entered the intersection and headed toward the powerless and dangerously exposed Plaintiff. Mr. Risbin, driving while intoxicated, admitted he was distracted by the two (2) police vehicles flanking the intersection. Unfortunately for Plaintiff, Markley and Cain were not trained properly and they failed to deter, redirect or warn Mr. Risbin of the peril ahead on the roadway. Instead, Mr. Risbin proceeded through the intersection where he ran-over the hapless and immobilized Plaintiff, who was left to his fate while Officer Markley jumped to safety and away from the danger he and Officer Cain created.

Quite clearly, the evidence shows: Officers Markley and Cain (1) created a foreseeable risk of direct harm to Plaintiff; (2) showed a willful disregard of the harm to Plaintiff; (3) Plaintiff was in police custody at the time he was injured; and (4) the use of police authority created a danger that otherwise would not have existed. Moreover, the use of handcuffs to immobilize Plaintiff while lying in a roadway was an excessive and unreasonable use of force. Indeed, the evidence shows Officers Markley and Cain had no reason to believe any force was necessary to remove Plaintiff from the roadway. Record evidence also shows that City of Washington Police conduct post-incident, across the spectrum, was patently unreasonable and below the standard of care.

Consider, on May 19, 2015, former City of Washington Police Chief, James Blyth presented for deposition. Chief Blyth was in charge of the police department at the time of the incident. When asked what information he had about this incident, extraordinarily, Chief Blyth claimed he knew nothing of it until served a subpoena to appear and testify at his deposition, four (4) years post-incident. Despite such an incredulous lack of knowledge regarding the incident, during deposition, Chief Blyth offered numerous other and disquieting admissions.

Chief Blyth admitted that City of Washington Police never adopted and did not use the police policy and procedure manual approved for use by city council. Chief Blyth stated, to the extent the department used the manual at all, it was only as a guide, and that his department relied upon "common sense" and "human compassion" to be an effective force. Chief Blyth further admitted, to his knowledge, the department never conducted any investigation or conducted any sort of after-action review with Officers Markley and Cain regarding the reasonableness of their conduct over the course of the incident. Finally, Chief Blyth admitted that, *inter alia*, had this outrageous incident involved an intoxicated Washington and Jefferson college student rather than Plaintiff, he would certainly have known about it before his officers returned to the station that night.

Likewise, the depositions of numerous other officers and supervisors within the City of Washington Police Department revealed a manifest failure to train, supervise and improve officers' competency and performance. More specifically, Captain Robert Wilson confirmed Chief Blyth's testimony that the policy and procedure manual was never adopted by the police department. Additional testimony revealed the police manual was desperately outdated, with no major revisions to any substantive policies, dating back to the 1990's. Testimony from every officer and supervisor established that annual performance reviews were exceedingly rare or non-existent, despite the practice being mandated by policy. Incredibly, Officer Markley expressly testified that in his years with the City of Washington Police Department, he never was given an annual performance review. In fact, he disavowed having ever seen or reviewed the department's performance review document. Yet, despite this significant policy omission by City of Washington Police, every officer deposed agreed that, an annual performance review can be, or in fact is, a critical developmental tool that aids training and overall competency.

Supervising officers were questioned at length and in detail regarding what inquiries, if any, were made about the incident. City of Washington Police were asked what steps were taken to evaluate the reasonableness of the conduct of Officers Markley and Cain; and, how it came to

pass that a citizen in police custody was run-over by a drunk driver. Overall, the evidence shows supervising officers were utterly incurious about the incident. By way of example, Lieutenant Daniel Stanek, a detective with the department, interviewed Officer Markley after the incident. Apparently Lt. Stanek made no attempt to critically review the facts or question Markley about his actions and decisions. Likewise, Lieutenant Yancosek, the officer in charge of Markley and Cain that night, never interviewed the officers or deemed it necessary to investigate the incident beyond reviewing their narrative reports. For his part, Officer Markley believed he did nothing wrong. In fact, when asked whether he did anything right or wrong that night, Officer Markley stated: "No. I mean they told me congratulations, way to go home that night. They are happy that I'm still alive. I could have been killed that night."

## V.   WITNESSES APPEARING BY MEANS OF DEPOSITION

Witness Ken Bollinger, 911 supervisor for the City and County of Washington died in May 2015. Plaintiff requests and reserves the right to read all or parts of his deposition at trial.

## VI. EXPERT REPORTS

1.      Robson Forensic, Inc.
        Michael J. McCabe, Jr., Ph.D., DABT, ATS
        354 North Prince Street
        Lancaster, PA 17603

        See attached report dated September 24, 2015.

2.      Chuck Drago
        Drago Professional Consultants LLC
        P.O. Box 623511
        Oviedo, Florida 32762-3511

        See attached report dated August 20, 2015.

3.      James M. Russavage, DMD, MD
        Scaife Hall, 6B
        3550 Terrace Street
        Pittsburgh, PA 15261

        See attached report dated July 2, 2015.

4.      Dr. Bruce Wright
         110 Ft. Couch Road, Suite 5
         Pittsburgh, PA 15241

         See attached report dated July 17, 2014, and April 29, 2015.

## VII. SPECIAL DAMAGES

1.      PA Department of Public Welfare is asserting a lien in the amount of $30,719.24.

## VIII. UNUSUAL LEGAL ISSUES

1.      Plaintiff is currently housed in SCI Laurel and will need permission to attend trial without

handcuffs.

2.      Plaintiff will move for a spoliation of evidence instruction.

## IX. TRIAL

         Trial by jury, lasting approximately 8-12 days for Plaintiff's case in chief**.**

## X. PLANTIFF'S EXHIBITS

         Plaintiff hereby grants permission to counsel for Defendants to examine Plaintiff's trial

exhibits at the offices of Ogg, Murphy & Perkosky, P.C.

## XI.   OPPOSING PARTIES' EXHIBITS

         Plaintiff's counsel will indicate agreement or disagreement with the authenticity and

admissibility of defendants' exhibits once they are identified and Plaintiff's counsel has had an

opportunity to examine them.

                                             Respectfully submitted,

                                             **OGG, MURPHY & PERKOSKY, P.C.**

                                             /s/ David Kennedy Houck
                                             Gary J. Ogg, Esquire
                                             David Kennedy Houck, Esquire
                                             Eve M. Elsen, Esquire
                                             Pa. I.D. No. 34515 (Ogg)
                                             Pa. I.D. No. 202280 (Houck)
                                             Pa. I.D. No. 309653 (Elsen)
                                             245 Fort Pitt Boulevard
                                             Pittsburgh, PA 15222
                                             412.471.8500

## CERTIFICATE OF SERVICE

I hereby certify that on September _____, 2015, a copy of the foregoing *Plaintiff's Pretrial Statement and Witness List* was filed electronically, and served upon the Court via hand delivery.   Notice of this filing will be sent to all parties by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

/s/David Kennedy Houck

*Counsel for Plaintiff*