PLAINTIFF'S
EXHIBIT
14
No. 13-1483

I/NetViewer – Event Search

Location Information

Number | Direction | Type

Street

Suffix | Area | Municipality: WASH | Apartment

ESZ | Beat

Sort Keys: Date/Time

☐ Descending

Caller Information

Name

Address

Phone | Source

Calltaker ID | Terminal

Modifiers

☑ Open Events ☐ Late Run

☑ Closed Events ☐ Use Time as Range

General Event Information

Event Number | Event Type

Case Number | SubType

From Date: 10/16/2011 | From Time: 12:30:00 AM | Agency: WCP | Disp Code | Primary Unit | Priority

To Date: 10/16/2011 | To Time: 3:00:00 AM | DGroup | Situation | Comments

Submit



# Event Summary

| Row | Agency | DGroup | Pri | Date | Time | Event Number | Type | Subtype | Unit | Location | Muni |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | WCP | PD90 | 8 | 10/16/2011 | 12:43:40 AM | P1110160017 | TRAF | | | 600 W CHESTNUT ST: @STAR CARPET | WASH |
| 2 | WCP | PD90 | 6 | 10/16/2011 | 12:56:13 AM | P1110160024 | RDHAZ | | | E BEAU ST/N LINCOLN ST | WASH |
| 3 | WCP | PD90 | 5 | 10/16/2011 | 1:38:59 AM | P1110160049 | 911IN | | | 155 WILSON AVE: @WASHINGTON HOSPITAL | WASH |
| 4 | WCP | PD90 | 8 | 10/16/2011 | 1:44:16 AM | P1110160053 | TRAF | | | 88 N MAIN ST: @ERNIES FREESTYLE RESTAURANT | WASH |
| 5 | WCP | PD90 | 6 | 10/16/2011 | 2:14:51 AM | P1110160065 | INTOX | | 9032 | JEFFERSON AVE/W CHESTNUT ST | WASH |
| 6 | WCP | PD90 | 3 | 10/16/2011 | 2:18:41 AM | P1110160071 | SHOTS | | 4330 | 785 ADDISON ST | WASH |

Normal View

# Event Information -- P1110160065

| Location Information | | Caller Information | |
|---|---|---|---|
| Number | | Name | |
| Direction | | Address | |
| Street | | Phone | |
| Type | | Terminal | psapbw08 |
| Suffix | | Calltaker ID | 91021 |
| Area | | Source | OFFICER |
| Municipality | WASH | Remarks | ** LOI search completed at 10/16/11 02:14:51<br>Field Event<br>** Case number P90011008941 has been assigned for WCP:PD90<br>** >>>> by: DEBBIE CADEZ on terminal: psapbw08<br>** VEH search completed at 10/16/11 02:14:59<br>REQT EMS AND A HELICOPTER<br>VEH HIT INTOX PEDESTERIAN<br>** Case number P56011000991 has been assigned for WCP:PD56<br>** >>>> by: DEBBIE CADEZ on terminal: psapbw08<br>MEDEVAC 1 HOME AND AVAILABLE GOING TO LZ 5401 SHOP AND SAVE // LESS THAN 5<br>TALKING TO COMMAND 54 ON 155.340<br>5409 REQ HELI IN THE AIR<br>** LOI search completed at 10/16/11 02:33:42<br>1 MALE 95 TO WASH HOSPITAL<br>** LOI search completed at 10/16/11 02:45:31<br>SM..714<br>EM..716<br>MALE FROM WASH ER TO STATION<br>** LOI search completed at 10/16/11 03:18:42<br>AT STATION EM..717 |
| Apartment | | | |
| X-Street 1 | JEFFERSON AVE | | |
| X-Street 2 | W CHESTNUT ST | Case Numbers | P56011000991<br>P90011008941 |
| Date | 10/16/2011 | Disp Codes | COMPLETED |
| Event Type | INTOX – INTOXICATED PERSON | | |
| Muni | WASH | | |

| Agency | P | Esz | Area | DGroup | Add | Dispatch | Arrive | Close | Cls ID | Cls Term | Event | Comments | Prim Unit | Situation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WCE | 6 | 54001 | 5400 | EM54 | 2:16:58 AM | 2:17:16 AM | 2:21:23 AM | 3:20:28 AM | 91079 | psapbw112 | E1110160008 | | 5400 | |
| WCP | 6 | 54001 | 90 | PD90 | 2:14:51 AM | 2:14:51 AM | 2:14:52 AM | 7:15:58 AM | 91020 | psapbw05 | P1110160065 | | 9032 | |

Details | Chronology | Add Comments | Unit | *Supplemental | Reprint Clear Report | *LOI

# Event Chronology -- P1110160065

☑ System Comments

| Time | Date | Terminal | Operator | Action |
|---|---|---|---|---|
| 2:14:51 AM | 10/16/2011 | psapbw08 | 91021 | EVENT CREATED: WASH , Cross Streets=JEFFERSON AVE /W CHESTNUT ST , Call Source=OFFICER |
| | | | | Agency=WCP, Group=PD90, Beat=90, Status=A, Priority=6, ETA=0, Hold Type=0, Primary Unit=9032, Primary Member=0, Current=F, Open Current=F, Type Code=INTOX-INTOXICATED PERSON |
| | | | | Unit=9032, Status=DP, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90059 |
| | | | | EVENT COMMENT=Field Event |
| | | | | ** LOI search completed at 10/16/11 02:14:51 |
| | | | | SUPP INFO CREATED: VEHIC: , State=PA, License Year=2011, License Type=PC |
| 2:14:52 AM | 10/16/2011 | psapbw08 | 91021 | Unit=9032, Status=AR, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90059 |
| 2:14:52 AM | 10/16/2011 | psapbw08 | | EVENT COMMENT=** Case number P90011008941 has been assigned for WCP:PD90 |
| 2:14:52 AM | 10/16/2011 | psapbw08 | | ** >>>> by: DEBBIE CADEZ on terminal: psapbw08 |
| | | | | CASE NUMBER ASSIGNED=P90011008941 |
| 2:14:59 AM | 10/16/2011 | psapsvr11 | 91021 | EVENT COMMENT=** VEH search completed at 10/16/11 02:14:59 |
| 2:16:46 AM | 10/16/2011 | psapbw02 | 91041 | Unit=9031, Status=DP, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90041 |
| 2:16:47 AM | 10/16/2011 | psapbw02 | 91041 | Unit=9031, Status=AR, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90041 |
| 2:17:26 AM | 10/16/2011 | psapbw08 | 91021 | EVENT COMMENT=REQT EMS AND A HELICOPTER |
| 2:17:40 AM | 10/16/2011 | psapbw08 | 91021 | EVENT COMMENT=VEH HIT INTOX PEDESTERIAN |
| 2:18:31 AM | 10/16/2011 | psapbw08 | 91021 | Unit=5630, Status=DP, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=56038 |
| 2:18:32 AM | 10/16/2011 | psapbw08 | 91021 | Unit=5630, Status=AR, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=56038 |
| 2:18:32 AM | 10/16/2011 | psapbw08 | | EVENT COMMENT=** Case number P56011000991 has been assigned for WCP:PD56 |
| 2:18:32 AM | 10/16/2011 | psapbw08 | | ** >>>> by: DEBBIE CADEZ on terminal: psapbw08 |
| | | | | CASE NUMBER ASSIGNED=P56011000991 |
| 2:19:33 AM | 10/16/2011 | psapbw02 | 91041 | EVENT COMMENT=MEDEVAC 1 HOME AND AVAILABLE GOING TO LZ 5401 SHOP AND SAVE // LESS THAN 5 |
| 2:19:40 AM | 10/16/2011 | psapbw02 | 91041 | EVENT COMMENT=TALKING TO COMMAND 54 ON 155.340 |
| 2:19:52 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9032, Status=~, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90059 |
| 2:20:43 AM | 10/16/2011 | psapbw02 | 91041 | Unit=9032, Status=CU, Comment=Alarm Timer Extended: 0, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90059 |
| 2:21:47 AM | 10/16/2011 | psapbw02 | 91041 | Unit=9031, Status=~, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90041 |
| 2:22:00 AM | 10/16/2011 | psapbw02 | 91041 | Unit=9031, Status=CU, Comment=Alarm Timer Extended: 0, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=90041 |
| 2:22:31 AM | 10/16/2011 | psapbw112 | 91079 | EVENT COMMENT=5409 REQ HELI IN THE AIR |
| 2:23:32 AM | 10/16/2011 | psapbw05 | 91037 | Unit=5630, Status=~, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=56038 |
| 2:23:39 AM | 10/16/2011 | psapbw05 | 91037 | Unit=5630, Status=CU, Comment=Alarm Timer Extended: 0, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=56038 |
| 2:33:42 AM | 10/16/2011 | psapsvr11 | 91079 | EVENT COMMENT=** LOI search completed at 10/16/11 02:33:42 |
| 2:34:34 AM | 10/16/2011 | psapbw109 | 91024 | Unit=9031, Status=UE, Location=JEFFERSON AVE/W CHESTNUT ST WASH |
| 2:34:35 AM | 10/16/2011 | psapbw109 | 91024 | Unit=9031, Status=UE, Location=JEFFERSON AVE/W CHESTNUT ST WASH |
| 2:34:42 AM | 10/16/2011 | psapbw109 | 91024 | Unit=9032, Status=UE, Location=JEFFERSON AVE/W CHESTNUT ST WASH |
| 2:34:43 AM | 10/16/2011 | psapbw109 | 91024 | Unit=9032, Status=UE, Location=JEFFERSON AVE/W CHESTNUT ST WASH |
| 2:45:20 AM | 10/16/2011 | psapbw05 | 91037 | EVENT COMMENT=1 MALE 95 TO WASH HOSPITAL |
| 2:45:31 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9032, Status=TR, Location=155 WILSON AVE WASH: @BLS TX WASHINGTON |

| | | | | |
|---|---|---|---|---|
| 2:45:31 AM | 10/16/2011 | psapsvr11 | 91037 | EVENT COMMENT=** LOI search completed at 10/16/11 02:45:31 |
| 2:45:37 AM | 10/16/2011 | psapbw05 | 91037 | EVENT COMMENT=SM..714 |
| 2:49:21 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9032, Status=TA, Location=155 WILSON AVE WASH: @BLS TX WASHINGTON |
| 2:49:26 AM | 10/16/2011 | psapbw05 | 91037 | EVENT COMMENT=EM..716 |
| 3:18:19 AM | 10/16/2011 | psapbw05 | 91037 | EVENT COMMENT=MALE FROM WASH ER TO STATION |
| 3:18:38 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9032, Status=TR, Location=56 W STRAWBERRY AVE WASH: @MUNI 90 WASHINGTON CITY |
| 3:18:42 AM | 10/16/2011 | psapsvr11 | 91037 | EVENT COMMENT=** LOI search completed at 10/16/11 03:18:42 |
| 3:19:11 AM | 10/16/2011 | $5630 | 56038 | Unit=5630, Status=AK, Location=JEFFERSON AVE/W CHESTNUT ST WASH, Employee=56038 |
| 3:22:06 AM | 10/16/2011 | psapbw05 | 91037 | Unit=5630, Status=AM, Employee=56038 |
| 3:22:32 AM | 10/16/2011 | psapbw05 | 91037 | EVENT COMMENT=AT STATION EM..717 |
| 3:37:02 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9031, Status=AV |
| 4:48:38 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9032, Status=~, Location=56 W STRAWBERRY AVE WASH: @MUNI 90 WASHINGTON CITY |
| 4:48:45 AM | 10/16/2011 | psapbw05 | 91037 | Unit=9032, Status=CU, Comment=Alarm Timer Extended: 0, Location=56 W STRAWBERRY AVE WASH: @MUNI 90 WASHINGTON CITY |
| 7:15:57 AM | 10/16/2011 | psapbw05 | 91020 | Unit=9032, Status=AV |
| 7:15:58 AM | 10/16/2011 | psapbw05 | 91020 | Agency=WCP, Group=PD90, Beat=90, Status=A, Priority=6, ETA=0, Hold Type=0, Primary Unit=9032, Primary Member=0, Current=T, Open Current=F, Type Code=INTOX-INTOXICATED PERSON |
| | | | | EVENT CLOSED |

# Event Unit Information

| Unit ID | CarID | Agency | DGroup | Status | Time | Emp | ID | Terminal | Location | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| 9032 | | WCP | PD90 | DP | 2:14:51 AM | 90059 | 91021 | psapbw08 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9032 | | WCP | PD90 | AR | 2:14:52 AM | 90059 | 91021 | psapbw08 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9031 | | WCP | PD90 | DP | 2:16:46 AM | 90041 | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9031 | | WCP | PD90 | AR | 2:16:47 AM | 90041 | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5400 | | WCE | EM54 | DP | 2:17:16 AM | | 91036 | psapbw10 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5409 | | WCE | EM54 | DP | 2:17:27 AM | | 91036 | psapbw10 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5409 | | WCE | EM54 | ER | 2:17:31 AM | | 91036 | psapbw10 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5400 | | WCE | EM54 | AQ | 2:17:58 AM | | 91036 | psapbw10 | 5400 BASE | |
| 5630 | 5630 | WCP | PD56 | DP | 2:18:31 AM | 56038 | 91021 | psapbw08 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5630 | 5630 | WCP | PD56 | AR | 2:18:32 AM | 56038 | 91021 | psapbw08 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5409 | | WCE | EM54 | ER | 2:19:17 AM | | 91079 | psapbw112 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9032 | | WCP | PD90 | ~ | 2:19:52 AM | 90059 | 91037 | psapbw05 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9032 | | WCP | PD90 | CU | 2:20:43 AM | 90059 | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | Alarm Timer Extended: 0 |
| MEDEVAC | | WCE | AIR | DP | 2:20:57 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| MEDEVAC | | WCE | AIR | XB | 2:21:07 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| MEDEVAC | | WCE | AIR | UC | 2:21:08 AM | | 91041 | psapbw02 | STAT MEDEVAC | |
| MEDEVAC1 | | WCE | AIR | XC | 2:21:09 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| MEDEVAC1 | | WCE | AIR | AK | 2:21:09 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| MEDEVAC1 | | WCE | AIR | XC | 2:21:10 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| MEDEVAC1 | | WCE | AIR | XE | 2:21:11 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | MEDEVAC |
| 5409 | | WCE | EM54 | AR | 2:21:23 AM | | 91079 | psapbw112 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9031 | | WCP | PD90 | ~ | 2:21:47 AM | 90041 | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9031 | | WCP | PD90 | CU | 2:22:00 AM | 90041 | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | Alarm Timer Extended: 0 |
| MEDEVAC1 | | WCE | AIR | ~ | 2:22:09 AM | | 91077 | psapbw104 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5630 | 5630 | WCP | PD56 | ~ | 2:23:32 AM | 56038 | 91037 | psapbw05 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5630 | 5630 | WCP | PD56 | CU | 2:23:39 | 56038 | 91037 | psapbw05 | JEFFERSON AVE/W CHESTNUT ST | Alarm Timer |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | AM | | | | WASH | Extended: 0 |
| MEDEVAC1 | | WCE | AIR | CU | 2:23:40 AM | | 91037 | psapbw05 | JEFFERSON AVE/W CHESTNUT ST WASH | Alarm Timer Extended: 0 |
| MEDEVAC1 | | WCE | AIR | ER | 2:23:52 AM | | 91041 | psapbw02 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| MEDEVAC1 | | WCE | AIR | AR | 2:32:59 AM | | 91079 | psapbw112 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5409 | | WCE | EM54 | TR | 2:33:41 AM | | 91079 | psapbw112 | TO LZ | |
| 5409 | | WCE | EM54 | TA | 2:33:52 AM | | 91079 | psapbw112 | TO LZ | |
| 9031 | | WCP | PD90 | UE | 2:34:34 AM | | 91024 | psapbw109 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9031 | | WCP | PD90 | UE | 2:34:35 AM | | 91024 | psapbw109 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9032 | | WCP | PD90 | UE | 2:34:42 AM | | 91024 | psapbw109 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9032 | | WCP | PD90 | UE | 2:34:43 AM | | 91024 | psapbw109 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 9032 | | WCP | PD90 | TR | 2:45:31 AM | | 91037 | psapbw05 | 155 WILSON AVE WASH: @BLS TX WASHINGTON | |
| 9032 | | WCP | PD90 | TA | 2:49:21 AM | | 91037 | psapbw05 | 155 WILSON AVE WASH: @BLS TX WASHINGTON | |
| 9032 | | WCP | PD90 | TR | 3:18:38 AM | | 91037 | psapbw05 | 56 W STRAWBERRY AVE WASH: @MUNI 90 WASHINGTON CITY | |
| 5630 | 5630 | WCP | PD56 | AK | 3:19:11 AM | 56038 | 56038 | $5630 | JEFFERSON AVE/W CHESTNUT ST WASH | |
| 5409 | | WCE | EM54 | AQ | 3:19:30 AM | | 91079 | psapbw112 | 5400 BASE | |
| MEDEVAC1 | | WCE | AIR | AQ | 3:20:28 AM | | 91079 | psapbw112 | STAT MEDEVAC | |
| 5630 | 5630 | WCP | PD56 | AM | 3:22:06 AM | 56038 | 91037 | psapbw05 | | |
| 9031 | | WCP | PD90 | AV | 3:37:02 AM | | 91037 | psapbw05 | | |
| 9032 | | WCP | PD90 | ~ | 4:48:38 AM | | 91037 | psapbw05 | 56 W STRAWBERRY AVE WASH: @MUNI 90 WASHINGTON CITY | |
| 9032 | | WCP | PD90 | CU | 4:48:45 AM | | 91037 | psapbw05 | 56 W STRAWBERRY AVE WASH: @MUNI 90 WASHINGTON CITY | Alarm Timer Extended: 0 |
| 9032 | | WCP | PD90 | AV | 7:15:57 AM | | 91020 | psapbw05 | | |

Print CRS W0241130

Page 8 of 8

PLAINTIFF'S EXHIBIT 15 No. 13-1483

Crash Number: W0241130
Incident Number: 11008941

N
NOT TO SCALE
Jefferson Ave.
Chestnut St.

EXHIBIT
MARKley
1
GME 12/8/14

http://www.dot6.state.pa.us/crsapp/PrintImages/XmlFiles/20111063622011102111365l3 10/21/2011



PLAINTIFF'S EXHIBIT 16 No. 13-1483

Google earth

feet 200

meters 60

PENGAD 800-631-6989 EXHIBIT Maybley 2 6/4/14

PLAINTIFF'S EXHIBIT 17 No. 13-1483

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - -

JERRY L. RAY, )
)
Plaintiff, )
)
-vs- ) Civil Action
) No. CV13-01483-DSC
MICHAEL CAIN; an )
individual, JAMES MARKLEY,)
an individual; and CITY )
OF WASHINGTON, )
)
Defendants. )

- - - -

VIDEOTAPE DEPOSITION OF: ROBERT LEMONS

- - - -

DATE: June 30, 2015
Tuesday, 9:00 a.m.

LOCATION: Washington City Hall
55 West Maiden Street
Washington, PA 15301

TAKEN BY: Plaintiff

REPORTED BY: JoAnn M. Brown, RMR, CRR
Notary Public
Reference No. JB38303

Q. But that wasn't customary?
Sometimes they ended up on your desk; sometimes you went and looked at them yourself?
A. Right.
Q. Okay. When you became chief, was there any system that you changed or any policies that you changed, or did you just pretty much keep everything the way it was back when Chief Blyth ran it?
A. I changed the uniform. We went from having white T-shirts underneath our summer uniforms to black. I sent a lot of guys to school and trainings.
Q. You sent guys to trainings. What kind of trainings?
A. Just any training that came along, I tried to find people that wanted to go.
Q. Okay. Was this outside of the MPOETC requirements?
A. Yes.
Q. Any recollection of what type of trainings they were, do you remember?
A. It was through Allegheny County Police Academy. They offer a multitude of classes.

They were juvenile custody stuff, underage drinking. I can't recall everything.
Q. Just whatever came up.
So this is a new change that you instituted when you became chief?
A. I don't think it was actually considered a change, it's just, if I seen a class that I thought somebody might be interested in, I'd just approach them and see if they wanted to go.
Q. So it's something you thought was important, and you promoted extra trainings within the department?
A. Yeah, if it was possible.
Q. Ever remember Chief Blyth promoting extra trainings in the department?
A. Yes.
Q. You do?
A. Mm-hmm.
Q. What type of trainings would he promote?
A. He sent a couple people to intoxilizer school. He sent me to truck school, truck inspection school for two weeks to do the DOT on the commercial vehicles. You know, just stuff like that.

Q. Do you remember any type of trainings on how to deal with intoxicated individuals in roadways or near roadways?
A. We deal with intoxicated people every day.
Q. I bet.
Any trainings on how to do it properly?
A. Specific trainings? I don't think there are.
Q. You've never been to any?
A. I've never seen any.
Q. You've never hosted any or encouraged anybody to go to anything like that?
A. I've never seen anything offered like that.
Q. I think you said the ICRs, the Incident Crime Reports --
A. Mm-hmm. Initial.
Q. Initial.
-- is this a system that you still have here today or was this back in 2011?
A. No, it's been here since I started.
Q. Okay. How does it work?
What -- I understand the initial officers will write their own reports and file whatever criminal charges they want to file.
Does every officer do an Initial

Crime Report with their actual report that they hand write? Is that standard?
A. That is the handwritten report --
Q. Okay.
A. -- is the Initial Crime Report.
Q. Okay. And -- okay. I'm going to hand you what's marked at the top of the page Washington Police Department Initial Crime Report.
I assume this is the Initial Crime Report that you're talking about?
A. Yes, that's what it looks like.
Q. Okay. So every time there's an incident that an officer is engaged in, he will write up or fill out this document?
A. No.
Q. No?
Okay. When does an officer fill this out?
A. When it's a criminal offense.
Q. When they anticipate filing criminal charges?
A. Not necessarily.
Q. Explain.
A. If I get called -- anything in the Crimes Code has to go on here. A criminal mischief report

could be -- he or she could be run over by a vehicle?
A. I think anybody laying in the road is susceptible to be run over by a vehicle.
Q. It's an obvious danger?
A. If you're in the road.
Q. Anyone would recognize this, police officer or not, right?
A. I'm pretty confident anybody would recognize that problem.
Q. Earlier you were testifying about how to use your car to block the intersection to protect someone if they are lying in the roadway. Officer Markley testified that he was never trained on how to use his vehicle to block an intersection, and looking back, it would have been a good idea to do that.

Any explanation you can give why one of your officers who had been with the department for years prior to that incident didn't know how to use their car to block the intersection?
A. I thought you said he partially blocked it.
Q. I did not say that.
A. Oh. There's no schools out there to teach you

how to position a car to block an intersection. It's just -- you just do it.
Q. Is there any attempt by the department to make sure that your officers know what they're doing when they encounter something in the roadway and how to use their car to block the intersection?
A. Yeah, we've had stuff happen before where no one has had an issue.
Q. What do you mean?
A. I mean, there's been accidents and everything else where we blocked roadways with cars.
Q. Okay. The department itself has certainly encountered this type of situation before?
A. Blocking off roads?
Q. Right.
A. Yes.
Q. Okay. My question is, has there ever been any type of training or attempt by the department to make sure all officers in the department know how to use their car to block an intersection?
A. I don't think there is a specific training for that.
Q. Okay. So nothing in the department has ever

been done?
A. No.
Q. Okay. Now knowing that one of your officers didn't know how to use their car to block the intersection, is that something that maybe should be training in the department to make sure that all officers, whether they're new officers or they've been on the force, know how to use their care to block off an intersection?
A. I've never had any issues with any of the guys that work for me not knowing how to block a road.
Q. Okay. But I'm saying there was an issue that night with one of the officers.

Now that you know that there's that issue out there, is that something that you think the department might want to do a training on?
A. It probably would be a good idea to look into it.

MR. CAMBEST: Looks like we have a lot more to go. Can we take a five-minute break?

MS. ELSEN: Yeah.

THE VIDEOGRAPHER: We'll be going off the record. The time indicated on the screen is 10:36 a.m.

\- - - -

(There was a recess in the proceedings.)

\- - - -

THE VIDEOGRAPHER: We are now back on the record. The time indicated on the screen is 10:42 a.m.

BY MS. ELSEN:
Q. Lieutenant, we were just talking about using your car and how to use your car to block the intersection. I told you that Officer Markley testified that he had never been trained on how to do it, and he didn't do it in this particular instance.

Lieutenant, if assuming that fact to be true that Lieutenant -- Officer Markley had never been trained on how to use his car to block the intersection when he encountered something in the roadway, you can't testify one way or the other how Officer Markley used his car in the past?

In other words, you don't know whether he's encountered an obstruction in the

roadway and failed to use his car to block the intersection in the past?
A. I can only go on what -- when he worked for me, what I've seen him do, and I've seen him -- like, on house fires, I've had him block the whole road with his car.
Q. Okay. Now, is that something --
A. And I didn't have to tell him how to do it, he just did it.
Q. Okay. So when got on your shift -- and when was he on your turn?
A. Well, he was on a couple years ago, then he worked for me last year.
Q. Okay. The incident that you're describing with the house fire, was that last year?
A. No -- oh, you know what, that was in 2000 -- I'm trying to think. I think 2010, because it was out on East Maiden Street. That's when we dragged a woman out. 2000 -- Kevin Brown was lieutenant. It was either '09 or '10.
Q. Okay. So --
A. 2009 or 2010.
Q. -- in that incident, did you direct him how to use his car to block the intersection --
A. No.

Q. -- or is that something he just did?
A. He just did it.
Q. Okay. In your experience back in '09 and '10 when he was on your turn and you saw him and the way he would use his car to block intersections, did you ever observe any types of problems or did he always do it appropriately and properly?
A. I never seen anything out of the ordinary.
Q. Okay. With your experience in how he would use his car to block an intersection one to two years before this particular instance, any explanation you can give why he wouldn't have used his car to block the intersection on October 16, 2011?
A. That's a really big intersection. I mean, you can't block the whole intersection with one car.
Q. That's fair, but he could have used his car to block Jerry Ray and protect him from motorists coming from the southerly directions.
A. Okay.
Q. Right?
A. I wasn't there. I don't know what he did.
Q. Okay. Assuming that Jerry Ray is laying on

Jefferson Avenue and there's a way you can position your car to block the motorists that are coming down the southerly lanes --
A. Okay.
Q. -- that's the way you'd want to position your car, right?
A. You'd position your car so other vehicles would have to go around the problem.
Q. Right, so they wouldn't strike and hit Jerry Ray?

So you could get him out of the street, fair?
A. Fair.
Q. Officers Cain and Markley testified that when they -- and they also put this in their report and testified more extensively, when they got out of their car, they walked up to Jerry Ray and there was a period of 30 seconds where they kicked his shoe, they had some contact, they were telling him to get up.

Lieutenant, can we agree that at that point they should have removed Jerry Ray from the street?
A. What position was he in?
Q. He's laying on the street, not injured, they

have contact, they're standing over him for a period of 30 seconds.

Any reason why they wouldn't have both taken an arm and moved him from the roadway?
A. I don't know why they didn't do that.
Q. Okay. Can we agree that that's what they should have done?
A. I'm not going to speculate, because I wasn't there. I mean, I don't know what they were doing.
Q. Okay. Assuming these facts to be true -- I understand you're not there, but assuming either you had been there or you were training your patrolmen on how to react in this particular situation, if you've got somebody in the roadway, you've got two officers and they're standing over him, any reason in the world you wouldn't instruct your patrolmen to get him out of the street?

MR. CAMBEST: Objection. You're note stating the whole facts. You're not stating that the gentleman was laying in the roadway, they didn't know whether or not he was injured or not. You know, if you're going

to call for backup?
Is that something that you might have done if you find someone -- an intoxicated individual or an individual generally, you don't know why he's in the roadway?
A. Is there another officer with me?
Q. There's two -- there are two officers.
Would calling for backup be something that you might do?
A. It depends on how big he is. I mean, I don't know what this guy looks like. If he's a real big guy, you might need more people to help you.
Q. Assuming he's 6-1 or 6-2 -- 6 foot, 275 pounds?
A. Am I going to get on and specifically call for backup like I would like for a fight or something, no.
Q. Okay. So you don't think -- you wouldn't call for backup in this particular situation?
A. I possibly might call for another car, but I don't know. I'd have to be there.
Q. Okay. In this situation, is there anything else you might do in terms of road flares,

anything like that?
A. No.
Q. Now, there's been testimony and the reports note that Jerry Ray gets up and starts to walk away from the officers.
Is there any reason that you can identify why the patrolmen wouldn't have immediately detained Jerry Ray and stopped him from walking away?
A. I'd have to be there. I mean, I don't know if there's other cars coming where they couldn't get to him right away or --
Q. No cars at that time, no cars are coming. He just stands up and starts to walk away.
Assuming those are the circumstances, any reason why the patrolmen shouldn't have grabbed him at that point and detained him?
A. I think I would have tried talking to him a little bit more to see exactly what was wrong with him instead of grabbing him.
Q. Would you have let him walk away from you, walk away in an intersection, or would you have tried to stop him?
A. I would have tried to stop him from crossing,

probably.
Q. Because it's unsafe to be wandering through an intersection, right?
A. The danger is there.
Q. The officers testified that they don't try to grab him, they don't try to stop him, they just give verbal commands to stop and he doesn't, he keeps walking and they just follow behind him.
Is that proper procedure just to follow behind a suspect when they're wandering through a very busy -- a potentially busy intersection?
A. Possibly they might have been trying to evaluate what their next step was going to be.
Q. Okay. Is that proper procedure to just follow behind somebody in the middle of an intersection that can become very dangerous very quickly?
A. I don't think there's any procedure on that. I think it's just, you know, things happen in a split of a second and you do the best you can with what you're presented with, and if the guy is walking away from them, you definitely don't want to get in a fist fight

or wrestling match with him in the middle of the road, so if he's going to a place of safety or across the street towards the sidewalk, I don't see a problem with, you know, making sure everybody gets to the other side of the street and then continue to deal with him.
Q. Okay. So you would just let him wander away from you and follow him?
You think that's proper procedure?
A. I didn't say that.
Q. Okay. Well, I just want to know your perspective, what you would do.
If a suspect is getting up and walking away from you and wandering in a potentially dangerous intersection, what would you do?
MR. CAMBEST: He already answered that question.
MS. ELSEN: No, he didn't.
MR. CAMBEST: And you keep making statements and not asking questions. You need to ask a question, so I'm going to object to the form.
BY MS. ELSEN:

Q. Okay. Can we also agree that if an officer fails to take those reasonable measures, then that particular person could be injured by a motorist?
A. The officer or the person that's injured?
Q. The person that's injured.
A. If anybody is in the roadway, they're susceptible to be injured.
Q. Lieutenant, would it be reasonable -- if you have an individual, you've detained him, you've immobilized him with handcuffs, would it be then reasonable to recognize that there needs to be some type of a flashlight or a strobe light activated to protect you as the officer and your suspect while you're in the roadway?
A. Just because you handcuff somebody, doesn't mean you immobilize them.
Q. Okay.
A. I mean, they still can kick you. They could still get up and run away.
Q. Assuming that they're laying down and they're handcuffed, we can agree it's difficult for someone that doesn't have the use of their arms and hands to be able to get up with any

great ease, right?
A. No, I've seen people get up that's handcuffed.
Q. Easily?
A. Yeah.
Q. So you think handcuffs don't immobilize anybody?
A. If they know what they're doing, they can get up on their knees onto their feet and run. I've seen it.
Q. Okay. Well, assuming that they are in handcuffs, they're not immobilized, is it reasonable to need to use a strobe light or a flashlight to signal to motorists that you have an individual in the roadway, you've got handcuffs on him, and you're in the middle of the street?
A. If I was in the street, I'd probably have a flashlight.
Q. Okay. Does it also make sense to have a flashlight when your police car, which isn't located nearby, has the flashing lights and is located in the opposite area of the intersection and you recognize that a motorist traveling down the street might be distracted by a police car with its lights on that isn't

near where you are with your suspect?
A. That's reasonable.
Q. Even more of a reason to have a strobe light or a flashlight illuminating where you are, right?
A. If you choose to turn it on, yeah. I mean, I don't know. I don't know what I would have did if that was me.
Q. In your experience, are there a higher percentage of intoxicated individuals after -- anywhere after 1 or 2 a.m. on a Saturday night into Sunday morning?
A. In this town?
Q. Yes.
A. Any time.
Q. Okay. Do you recognize, or in your experience, had there been a higher percentage of intoxicated individuals Saturday night after 2 a.m. versus during the day on a weekday?
A. No.
Q. So intoxicated individuals all the time any time?
A. Yep.
Q. Are officers trained that they should be even

more aware at certain times of the night on weekend nights for intoxicated individuals?
A. No, you're on alert for any problems any time you work.
Q. Lieutenant, do you agree that when you have a suspect in your custody, that you own them and you're 100 percent responsible for their safety?
A. Yes.
Q. Officer Markley testified that after this incident occurred, he was told by his supervising lieutenants and detectives that he did nothing wrong, he did everything 100 percent correct.
Now that you know that he did not use his car to block Jerry Ray when you first encountered him, is that the kind of advice or statement that you would have made if you had been his lieutenant?
MR. CAMBEST: Objection to the form of the question. That's a mischaracterization of his testimony.
Q. You can answer.
A. I'm not going to speculate. I wasn't there.
Q. Okay.

EXHIBIT Markley 9 GMC 12/4/14

PLAINTIFF'S EXHIBIT 18 No. 13-1483

# Main Narrative

PTL JAMES MARKLEY (57)

10/16/2011 02:14 - 57 PTL JAMES MARKLEY

OFFICER CAIN AND I WERE IN CITY POLICE UNIT #9032 WHEN WE WERE TRAVELING EAST ON WEST CHESTNUT STREET AND WHEN WE APPROACHED THE INTERSECTION OF JEFFERSON/CHESTNUT. AS WE APPROACHED THIS INTERSECTION, I OBSERVED TWO VEHICLES AT THE LIGHT, AN SUV AND A WHITE SEDAN TURNING RIGHT. JUST AFTER THE WHITE SEDAN TURNED RIGHT ON JEFFERSON, I NOTICED VICTIM LYING IN BETWEEN THE TWO SOUTHBOUND LANES, IN THE SOUTHWEST CORNER OF THE INTERSECTION. AT THIS POINT, I ACTIVATED MY EMERGENCY LIGHTS/PARKED MY VEHICLE, GOT OUT AND WENT TO CHECK ON THE VICTIM. AS I APPROACHED THE VICTIM, HE STOOD UP AND BEGAN STAGGERING TOWARDS THE NORTHEAST CORNER OF THE INTERSECTION. I GAVE THE VICTIM VERBAL COMMANDS TO STOP, HE TURNED AROUND AND LOOKED AT ME/ACKNOWLEDGE ME, BUT THEN TURNED AROUND AGAIN AND STARTED BACK TOWARDS THE NORTHEAST CORNER OF THE INTERSECTION, DURING WHICH HE SEEMED TO BE REACHING IN HIS POCKETS. CONSIDERING HE WAS REACHING IN HIS POCKETS AN WAS BIGGER THAN ME, NOT KNOW WHETHER OR NOT HE WOULD TURN AROUND WITH A WEAPON, I REMOVED MY TASER FROM MY HOLSTER MIDWAY THROUGH THE INTERSECTION. ONCE AT THE NORTHEAST CORNER OF THE INTERSECTION, HAVING ALREADY TOLD CAIN #062, TO "CALL IT OUT," ON THE RADIO, I ORDERED THE VICTIM TO THE GROUND TO KEEP HIM FROM RE-ENTERING THE INTERSECTION, TO AVOID HIM RUNNING FROM ME, AND BECAUSE IT WAS UNSURE OF WHETHER OR NOT HE HAD WEAPONS. JUST AS I THOUGHT HE WAS ABOUT TO COMPLY/SIT DOWN, HE FELL BACKWARDS, BOUNDED OF A LIGHT POLE AND FELL INTO THE RIGHT HAND LANE (NORTHBOUND) IN THE NORTHEAST CORNER OF THE INTERSECTION. OFFICER CAIN AND I THEN APPROACH HIM AGAIN AND HE WAS ATTEMPTING TO USE/HOLDING A CELL PHONE WHILE ON THE GROUND. I TOOK HIS CELL PHONE FROM HIM AND HE WAS HANDCUFFED. OFFICER CAIN WAS THEN ADVISED TO ACTIVATE THE STROBE LIGHT FEATURE ON HIS FLASHLIGHT BEING AS HOW WE WERE IN THE ROAD. OFFICER CAIN THEN INFORMED ME HE WAS GONG TO BRING OUR POLICE CAR OVER TO THE AREA FOR US TO GET HIM OUT OF THE ROAD AND 911 WAS NOTIFIED OF WHERE WE WERE.

THIS WAS THE THIRD TIME CAIN AND I HAD ATTEMPTED TO MAKE CONTACT WITH 911 AND THIS TIME WE WERE ACKNOWLEDGED. CAIN THEN HEADED TOWARDS HIS/OUR CAR, AND I BEGAN PULLING OUT MY OWN FLASHLIGHT. THE VICTIM THEN LOOKED AT ME AND STATED I'M NOT GIVING YOU A HARD TIME MAN, I'M NOT GIVING YOU A HARD TIME." I LOOKED AROUND, I LOOKED BACK AT THE VICTIM AGAIN AND SAID "OK, LISTEN, WITH YOUR LEFT LEG, WERE GOING TO GET OUT OF THE ROAD, WITH OUR LEFT LET, PULL YOUR KNEE UP TO YOUR CHEST." THE VICTIM DID AS I ASKED. THEN I LOOKED OVER MY LEFT SHOULDER AND SAW HEADLIGHTS APPROACHING. UNSURE OF WHETHER OR NOT THE CAR WAS SLOWING DOWN, I LOOKED BACK AT THE VICTIM, GRABBED A HOLD OF HIM, LOOKED BACK THE THE HEADLIGHTS THAT WERE OBVIOUSLY QUICKLY APPROACHING, AND DECIDED TO TRY AND PULL THE VICTIM OFF THE SIDE OF THE ROADWAY. BEING THAT THE APPROACHING VEHICLE WAS COMING TOWARDS ME FAST AND I WAS WORRIED ABOUT BEING STRUCK, HAVING A GRIP ON THE VICTIM, I TRIED TO PULL ON HIM AS I RAN TO SAFETY MYSELF. JUST AS I REALIZED HE WAS TOO HEAVY TO MOVE, I GOT OUT OF THE WAY. JUST AS I TURNED TO RUN OUT OF TRAFFIC AND MY BACK WAS TURNED FOR NO MORE THAN A SECOND, I HEARD THE VEHICLE STRIKE THE VICTIM. ONCE I GOT MY FOOTING BACK AND TURNED AROUND I SAW THE VICTIM STILL LYING IN THE ROADWAY AND THE VEHICLE SLOWING/COMING TO A REST JUST BEFORE THE CHURCH AT JEFFERSON/HALL. CAIN WAS ABOUT TO PULL UP IN THE CAR WHEN I ADVISED 911 TO SEND ME AN AMBULANCE AND GET THE LIFE FLIGHT ON THEIR WAY.

OTHER POLICE UNITS THEN ARRIVED ON THE SCENE. CAIN SPOKE WITH THE SUSPECT/DRIVER. CAIN THEN INFORMED ME THAT THE SUSPECT HAD LEFT WORK, WENT TO THE INDEPENDENCE CLUB AND "HAD A FEW BEERS". ACCORDING TO THE SUSPECT. THE SUSPECT WAS REMOVED FROM THE HIS VEHICLE AND GIVEN FIELD SOBRIETY BY THIS OFFICER. THE FIRST TEST WAS THE ONE LET STAND, AND HE COULD NOT KEEP HIS LEG OFF THE GROUND FOR MORE THAN ONE SECOND. THE SECOND TEST GIVEN WAS THE NINE STEP HEEL-TO-TOE AND HE COULD NOT WALK HEEL TO TOE AND ALMOST FELL OVER WHEN TURNING AROUND. THE THIRD TEST WAS THE FINGER TO NOSE WHERE HE WAS TOLD TO TOUCH HIS NOSE WITH HIS FINGER AND BRING HIS HAND BACK TO WHERE IT WAS AT THE BEING OF THE TEST, BUT KEPT HIS FINGER ON HIS NOSE ONCE HE TOUCHED IT.

11008941A

2111 - DRIVING UNDER THE INFLUENCE - ALCOHOL

## Main Narrative

PTL. JAMES MARKLEY (57)

THE SUSPECT WAS TAKEN INTO CUSTODY AND TRANSPORTED TO WASHINGTON HOSPITAL TO GIVE BLOOD FOR BAC READING. SGT. SULERUD TOOK PHOTOGRAPHS OF THE SCENE AND THE SUSPECT'S VEHICLE WAS IMPOUNDED BY ISIMINGERS TOWING.
THE SUSPECT WAS BROUGHT BACK TO THE STATION AND LATER RELEASED TO A FAMILY MEMBER, PEGGY RISBIN.

THE BLOOD EVIDENCE WAS PLACED IN THE EVIDENCE REFRIGERATOR. CHARGES ARE PENDING BASED ON BAC LEVELS AND CONDITION OF VICTIM.

Page No. 1 of 2

# WASHINGTON CITY POLICE DEPARTMENT

**Supplemental Report**

PLAINTIFF'S EXHIBIT 19 No. 13-1483

PENGAD 800-631-6989 CAIN 9 [illegible] 12/9/14

Date of Report 10/16/11

Case Name or Case Number 11008941

Suspect James Risbin

On 10/16/2011 at 0214 hrs this officer was the front seat passenger in City of Washington Police unit 90-32. At or around 0214 hrs myself and Ptlm James Markley approached the intersection at Jefferson and Chestnut Street, traveling east bound. As 90-32 approached the intersection there was a steady red light facing eastbound traffic with two vehicles sitting at the light, a SUV going straight and a white sedan turning right on Jefferson. When the light turned green for eastbound traffic, this officer and officer Markley noticed the victim, Jerry Roy DOB 3/5/65 lying in the southwest corner of the intersection. Officer Markley activated our units emergency lights and parked our unit at the southwest corner of the intersection. Both this officer and officer Markley exited the vehicle and approached the victim, Jerry Roy. Officer Markley was the first officer to make contact with victim Roy, has Officer Markley approached the victim the victim stood up and started walking toward the northeast corner of the intersection. The victim appeared to be very intoxicated and could barley maintain his balance. As the victim approached the northeast corner of the intersection he walked into the traffic light pole and fell back into the right traffic lane of Jefferson Ave. Officer Markley advised this officer to notify Washington control of an intoxicated pedestrian when we got out of the car, this officer was unable to reach control at that time. Officer Markley was able to reach control once the victim hit the pole and fell back into the roadway. Once the victim fell into the roadway this officer and officer Markley placed handcuffs on the victim and advised the victim he was being placed under arrest for public intoxication. This officer used a flashlight on a flash setting to warn oncoming traffic that we were in the roadway. Once the victim was handcuffed this officer advised officer Markley that I was going to move our police unit toward the northeast corner to warn oncoming traffic. As this officer got into the police unit I noticed the suspects vehicle traveling northbound on

Report submitted by: Michael Cain Rank Ofc

Page No. 2 of 2

# WASHINGTON CITY POLICE DEPARTMENT

**Supplemental Report**

Date of Report 10/16/11

Case Name or Case Number 11008941

Suspect James Risbin

---

Jefferson Ave in the right travel lane. As this officer started to move the car the suspect traveled threw the intersection at Jefferson and Chestnut traveling northbound, suspect did have a green light. the suspect then struck the victim who was lying in the roadway, who was trying to be moved from roadway by officer Markley. The victim was struck by the front passenger side of the suspect's vehicle, and dragged approximately 15 feet. The suspect's vehicle traveled approximately 50 feet further northbound. The suspect at this point backed the vehicle up to where the victim was lying. This officer pulled the police unit toward the northeast corner of the intersection, blocking north bound traffic. At this point officer Markley called control and advised them that the victim was hit by a vehicle and requested EMS and have a helicopter on standby. As officer Markley checked on the victim, this officer checked to see if the suspect was injured. The suspect stated he was not injured and was looking at the police unit being moved by myself and did not see the victim and officer Markley in the roadway. This officer asked the suspect if he had just left work, because the suspect had a uniform jacket on, the suspect stated he just left the Independence Club and he had a couple drinks. The suspect preformed field sobriety test and was transported to The Washington Hospital for a blood draw. to determine BAC. The victim was transported by EMS and the suspect was released to his sister Peggy Risbin.

---

Report submitted by: Michael Carr Rank OCJ

WASH 38

PLAINTIFF'S EXHIBIT 20 No. 13-1483

# TOXICOLOGIST'S REPORT

on the

Jerry Lavelle Ray Incident

By:

Michael J. McCabe, Jr., Ph.D., DABT, ATS

September 24th 2015

Robson Forensic

Engineers, Architects, Scientists & Fire Investigators

**Ray Incident**

**TOXICOLOGIST'S REPORT** **September 24th 2015**

## A. INTRODUCTION

On October 16th 2011 at approximately 2:15 AM, while handcuffed and being taken into police custody, Jerry Lavelle Ray, Jr. (DOB : was lying in the road near the northeast corner of the intersection of Jefferson Avenue and West Chestnut Street in Washington, Pennsylvania when he was struck and run over by a vehicle being driven by James M. Risbin. Ray sustained severe injuries as a consequence of these events. According to the police narrative (i.e., Patrolman Markley) of the incident, Ray initially was observed lying in the roadway between the southbound lanes of Jefferson Avenue near the southwest corner of the intersection. According to Officer Markley's account, when he first approached Ray, Ray stood up and began staggering toward the northeast corner of the intersection and he seemed to be outwardly intoxicated. Ray reportedly fell down near the northeast corner of the intersection and he was in the process of being detained (e.g., he had been handcuffed) when he was struck by Risbin's vehicle. Ray was transported emergently for treatment of his injuries to University of Pittsburgh Medical Center, where a blood specimen obtained at 4:00 AM revealed a serum alcohol concentration of 126 mg/dl. Also, Risbin, who was found to have a blood alcohol concentration of 0.154%, was charged in connection with this incident with driving under the influence of alcohol.

The purpose of my investigation was to determine

1) if Ray's level of intoxication (i.e., blood alcohol concentration) was consistent with and predictive of outward signs of intoxication as described by the police.

2) if Risbin's level of intoxication (i.e., blood alcohol concentration) was consistent with and predictive of impairment of divided attention tasks required to safely operate a motor vehicle.

## B. MATERIALS AVAILABLE FOR REVIEW

1. Police File, which includes the following:
    a. The City of Washington Police Department Criminal Investigation Report
    b. Commonwealth of Pennsylvania Police Crash Reporting Form
    c. Stat MedEvac Report
    d. City of Washington Fire Department EMS Report
2. UPMC Records – Jerry Ray Medical Records
3. Report of Bruce A. Wright, MD
4. Deposition transcript of Jerry Lavelle Ray dated December 18th 2014
5. Deposition transcript of James Risbin dated April 23rd 2015
6. Deposition transcript and Exhibits of Michael Cain dated December 9th 2014
7. Deposition transcript and Exhibits of James R. Blyth dated May 19th 2015
8. Deposition transcript and Exhibits of Matthew Day dated March 26th 2015

Robson Forensic
Engineers, Architects, Scientists & Fire Investigators

9. Deposition transcript and Exhibits of Christopher Luppino dated May 8th 2015
10. Deposition transcript of Kenneth Bollinger dated March 26th 2015
11. Deposition transcript of John Yancosek dated May 6th 2015
12. Deposition transcript and Exhibits of Daniel Stanek dated May 6th 2015
13. Deposition transcript and Exhibits of James Markley dated December 8th 2014
14. Deposition transcript and Exhibits of Stephen Colecchi dated May 8th 2015
15. Deposition transcript of Michael Sulerud dated August 31st 2015

## C. DESCRIPTION OF THE INCIDENT AND BACKGROUND

Officers Markley and Cain reported that at approximately 2:15 AM on the incident date they were on patrol together in a police cruiser when they observed Ray lying in the southbound lane of traffic in the southwest corner of Jefferson Avenue and West Chestnut Street. There were other (i.e., civilian) vehicles waiting at the intersection when the officers reportedly first noticed Ray. Officer Markley reported that when he first approached Ray, he stood up and began staggering toward the northeast corner of the intersection, and he (Ray) ignored Markley's verbal commands to stop. Markley reported that Ray was outwardly intoxicated. Out of concern for his safety, Officer Markley stated that he ordered Ray to the ground, but Ray instead fell to the ground again in the vehicle travel lane within the intersection. Markley reportedly handcuffed Ray, and was in the act of assisting Ray from the roadway, but failed to do so, which resulted in Ray being struck by Risbin's vehicle which was traveling northbound on Jefferson Avenue. Ray sustained severe injuries as a consequence of being struck by Risbin's vehicle. He was transported emergently for treatment of his injuries to University of Pittsburgh Medical Center, where a blood specimen at 4:00 AM revealed a serum alcohol concentration of 126 mg/dl.

Risbin had been drinking at a nearby bar after work. He was traveling home when he came upon the commotion occurring in the intersection caused by the police detaining Ray. The police report documents that "distracted driver" (i.e., Risbin) was a cause of the incident. Risbin failed standardized field sobriety testing and a blood specimen obtained from him at 3:06 AM revealed a blood alcohol concentration of 0.154%.

## D. ANALYSIS

Toxicology involves the study of the adverse effects of drugs and chemicals on human health and human performance. Accordingly, every toxicology issue involves two general aspects;

1) analysis of the exposure (in this case the doses of alcohol that Ray and Risbin consumed – the amount they drank and when they drank it) and,

2) analysis of the decrement in human performance caused or predicted by that dose (i.e., Ray's alleged manifestation of outward signs of intoxication while first interfacing with the police; Risbin's ability, or lack thereof, to safely operate a motor vehicle.

Dose is a fundamental principle of toxicology. Dose is defined as the amount of a drug (in this case alcohol) taken over a period of time. Accordingly, the toxicologist's concern invariably and

necessarily involves the reconstruction of dose either based on the application of pharmacokinetic[1] (preferable) or pharmacodynamic principles, or both.

Also important in the analysis of dose in the context of alcohol-related incidents is the concept of *standard drink*. A standard drink is defined by toxicologists and the alcoholic beverage service industry as a drink that contains 14.02 grams of alcohol - the equivalent amount of ethyl alcohol present in 5 ounces of wine (12% v/v), 12 ounces of beer (5% v/v) or 1.5 ounces of 80 proof (40% v/v) liquor.

**Absorption, Distribution, Metabolism and Elimination (ADME) of Alcohol.**

Absorption, distribution, metabolism and elimination (ADME) are fundamental toxicological principles applicable to many drugs and chemicals. The ADME of alcohol has been thoroughly studied through numerous scientific investigations. The information gleaned from these studies can be applied to reliably predict the blood alcohol concentration (BAC) vs. time profiles in forensic circumstances similar to this particular case.

Absorption of alcohol refers to its passage from the gastrointestinal tract into the bloodstream. Alcohol is absorbed across the gut epithelium into blood. Most of the absorption occurs in the small intestine, where the large surface area and rich blood supply facilitates alcohol uptake. Alcohol absorption into the blood most often is complete within 30 minutes following social alcoholic beverage consumption. However, peak absorption can vary (15 to 90 minutes is a reasonable estimate) following cessation of drinking depending on the circumstances and contributions of influencing factors. Examples of factors that influence the rate of alcohol absorption include amount consumed, rate of consumption, contents of the gastrointestinal tract, alcohol concentration of the beverage, and mixer type. While thirty minutes is a reasonable and conservative estimate of the time required for Ray to have reached the post-absorptive state following the consumption of his last drink, the time and location where he consumed his last drink is not entirely clear. Risbin's evidentiary blood alcohol concentration was determined at 3:06 AM (i.e., nearly 45 minutes after Ray was run over). As such, Risbin likely had achieved the post-absorptive state of alcohol pharmacokinetics by the time that his blood sample was collected, which means that his evidentiary blood alcohol test result of 0.154% is a reliable indicator of his state of intoxication at the time that he ran over Ray.

Distribution of alcohol refers to its partitioning into various body tissues including the brain where it acts as a central nervous system depressant. The distribution of alcohol, once absorbed, is largely a function of its equilibration with the body's water content. Generally speaking, the more an individual weighs, the more body water he or she has and the lower the BAC would be from the consumption of a given amount of alcohol (all other factors being equal).

---

[1] In layman terms pharmacokinetics describes what the body does to a drug (i.e., absorption, distribution, metabolism, elimination), while pharmacodynamics describes what the drug does to the body (e.g., alcohol is a CNS depressant).

Robson Forensic
Engineers, Architects, Scientists & Fire Investigators

Ray was reported to be a 46 year old man standing 71.5 inches tall and weighing approximately 257 pounds at the time of this incident. As such, his total body water content as calculated via the Watson formula is estimated to be approximately 56.8 liters.

Alcohol distributes within the human body as a function of water content. Since the water content of serum is higher than that of whole blood, Ray's serum alcohol concentration of 126 mg/dl as measured by the University of Pittsburgh Medical Center laboratory is expectedly higher than his corresponding blood alcohol concentration. Given Ray's hematocrit value of 41.2%, which also was determined via blood tests connected with his treatment at the hospital, his serum to whole blood alcohol conversion factor can be calculated as 1.15:1 (serum:whole blood), which is well within the expected population range of 1.02:1 to 1.25:1 (serum:whole blood). As such, **Ray's measured serum alcohol concentration of 126 mg/dl corresponds to a blood alcohol concentration (BAC) of 0.110% on his blood sample collected at 4:00 AM.**

Elimination of alcohol refers to its removal from the body by excretion through breath, sweat or urine or as a result of its metabolism. Most of the elimination of alcohol occurs as a result of its metabolism by liver enzymes. Most social drinkers metabolize and eliminate alcohol at a constant rate between 0.010 to 0.025 grams per deciliter per hour with an average elimination rate of 0.018 g/dL per hour. It is reasonable to expect that Ray was metabolizing alcohol at an average rate of 18 mg/dL per hour or within a range experienced by the majority of social drinkers (i.e., β factor between 0.01 to 0.025 g/dL per hour). Variation in Ray's actual rate of metabolism within this range was considered in ensuing calculations. Finally, although the discussion of alcohol ADME was separated out for this report, it is important to point out that these processes are occurring simultaneously at any given time.

These factors pertaining to the ADME of alcohol can be applied using standardized calculation to quantify the number of alcohol beverages that Ray had distributed within his body at the time that he interfaced with the police. Based on a BAC value of 0.141% (see next paragraph for rationale), Ray's circulating alcohol burden (CAB) at 2:15 AM was 99.3 grams - a lower limit estimate of the amount of alcohol that he had consumed (i.e., ~ 7.1 standard drinks). Ray's recollection of events related to this incident was murky. He testified that he had been at a bar where he had had a couple of drinks and then he walked out the door and started walking toward a Walgreen's Pharmacy located nearby where the incident occurred.

Using retrograde extrapolation based on Ray's BAC of 0.110% at 4:00 AM and the range of alcohol elimination rates discussed above (i.e., average rate of elimination of 0.018 g/dl per hour with a low and high rate of elimination of 0.01 g/dl and 0.025 g/dl, respectively), **Ray's BAC at the time of the incident at approximately 2:15 AM was 0.141% (range = 0.128% to 0.154%).** A more conservative analysis considers that Ray was not in the post-absorptive state of alcohol pharmacokinetics at the time of the incident. Accordingly, in such a scenario, the objective data (i.e., Ray's serum alcohol concentration of 128 mg/dl at 4:00 AM) informs that his peak blood alcohol concentration occurred at 2:45 AM at a level of 0.132% (range = 0.122% to 0.141%). Under this conservative scenario Ray's BAC at the time of the incident (i.e., 2:15 AM) was < 0.132% (range = 0.122% to 0.141%).

Robson Forensic
Engineers, Architects, Scientists & Fire Investigators

### Relationship between Blood Alcohol Concentration and Functional Impairment (i.e., Pharmacodynamic Effects of Alcohol Intoxication)

Alcohol is a central nervous system depressant. Accordingly, behavioral aberrations and performance deficits due to alcohol are explained by its effects on various regions of the brain and its ability to non-specifically alter the activities of various neurotransmitter receptors and signaling. The intensity of its CNS depressant effects is proportional to the concentration of alcohol in the blood, and the sensitivity of various brain regions that control various functions. In any individual, impairment due to alcohol intoxication progresses through stages as follows:

- Euphoria (BAC = 0.03% to 0.12%) characterized, in part, by loss of inhibitions and diminished attention, judgment and self-control; pharmacological effect of alcohol on the frontal lobe area of the brain.

- Excitement (BAC = 0.09% to 0.25%) characterized progressively by emotional instability, loss of critical judgment, impaired perception, memory and comprehension, decreased sensatory response, increased reaction time, sensory motor in-coordination, impaired balance, slurred speech, vomiting, drowsiness; pharmacological effect of alcohol involves increased frontal lobe decrements and beginning stages of parietal lobe and occipital lobe effects.

Ray's blood alcohol concentration at the time (i.e., 2:15 AM) that he was first interfacing with the police was consistent with biobehavioral indices of impairment consistent with the excitement stage of acute alcohol effects.

- Confusion (BAC = 0.18% to 0.30%) characterized, in part, by disorientation, mental confusion, apathy, lethargy, exaggerated emotional states, disturbances of vision, staggering and slurred speech; pharmacological effects include the above with more pronounced effects on occipital lobe.

- Stupor (BAC = 0.25% to 0.4%) characterized, in part, by marked muscular in-coordination (inability to stand or walk) and impaired consciousness; death possible; pharmacologic effects include pronounced effects of alcohol on cerebellum, medulla.

### Relationship between Blood Alcohol Concentration and Functional Impairment – Consideration of Ray's Outward Signs of Intoxication

The progressive impairing effects of alcohol (i.e., loss of inhibitions, followed by impaired judgment, followed by delayed reaction time, followed by loss of motor coordination) are a function of the sensitivity of the specific brain regions controlling these processes to alcohol (as indicated above). Although alcohol affects people differently, progressive impairment of these CNS-controlled activities has been associated with relatively well-defined BAC levels as indicated above. Visible signs of intoxication generally fall into the categories of delayed reaction time (e.g., slurred speech) and loss of motor coordination (e.g., staggering).

Robson Forensic
Engineers, Architects, Scientists & Fire Investigators

Impairment in CNS-controlled activities has been associated with relatively well-defined BAC levels. Scientific studies also have established that visible or outward signs of intoxication are present in the majority (i.e., more than 50%) of social drinkers at BACs of about 0.15%. At BAC's of about 0.20%, the overwhelming majority (i.e., > 84%) of all drinkers, including experienced drinkers who may manifest functional tolerance, display signs and symptoms consistent with visible intoxication. Ray was not a naïve drinker. As such, he had developed some form of tolerance to the effects of alcohol. **Practically speaking, this means that the BAC threshold whereby Ray would be expected to exhibit visible or outward signs of intoxication was certainly ≥ 0.15% and probably closer to 0.20%. As indicated above, Ray's BAC at the time that he interfaced with the police was 0.141% (range = 0.128% to 0.154%).**

### Relationship between Blood Alcohol Concentration and Functional Impairment – Consideration of Risbin's State of Intoxication and Decrement's in Performance of Divided Attention Tasks

Generally speaking, there are three types of studies that have demonstrated the relationship between alcohol intoxication and driving impairment; 1) epidemiological studies (e.g., population-based studies of drivers involved in motor vehicle crashes), 2) laboratory studies (e.g., experimental assessment of the impact of alcohol intoxication on driving-related skills), and 3) closed course or simulated driver studies.

The strong association between alcohol intoxication and increased risk of automobile crashes has been extensively documented in epidemiological studies. One recently published large scale case-control study supports the existence of a notable dose-related decrement beginning at blood alcohol concentrations as low as 0.04 – 0.05 g/dL and increasing exponentially at BACs of 0.10 g/dL or greater. The relative risk of a crash is approximately 22-fold and 30-fold at blood alcohol concentrations like Risbin's of 0.15% and 0.16%, respectively.

Driving a motor vehicle is a divided-attention task. In-other-words, safe driving requires proper apportioning of various learned skills such as; i) steering and maintaining lane position, ii) **awareness of traffic, other drivers, pedestrians, and other objects**, iii) maintaining speed (stopping, slowing, accelerating as conditions require), and iv) route planning. Numerous laboratory studies have been performed to assess impairment of skills important for driving at various levels of intoxication. These skills include assessment of compensatory tracking (i.e., ability to maintain position in lane), visual and auditory perception, reaction time, and other aspects of information processing and psychomotor performance. Studies have demonstrated significant impairment of these skills at blood alcohol concentrations in the 0.05 to 0.08% range and higher. However, it should be emphasized that deficits in such skills are not outwardly obvious (i.e., specialized tests are required to measure such skill deficits). The results of these experimental studies support the conclusion that **the skills required to safely operate a motor vehicle were impaired as a consequence of Risbin's intoxication at a level nearly twice the *per se* limit for driving while intoxicated.**

Robson Forensic
Engineers, Architects, Scientists & Fire Investigators

**Risbin's driving impairment manifested as an inability to perform divided attention tasks,** which also was evidenced by his testimony (pp. 31-32; p. 73); "As I was proceeding through the intersection, I was rubbernecking looking for an accident, who they pulled over, did somebody wreck? And as I turned around, there was one of the officers pulling Mr. Ray under his arms right in front of me, as I turned around like that (indicating) it was right there." "I glanced right first and then left and then back. Boom."

> Q. Okay. It's been your testimony that you did not see the officer and Mr. Ray in the roadway until immediately before striking Mr. Ray; is that correct?
>
> A. Correct.
>
> Q. And it's been your testimony that that's because you were looking at both of the police cruisers that had their lights -- blue and red lights on; is that correct?
>
> A. Yes.
>
> Q. So you were distracted by the police cars; is that correct?
>
> A. Yes.

## E. FINDINGS

Within the bounds of a reasonable degree of scientific certainty, based on the information available for review, it is my professional opinion that,

1) **Ray's measured serum alcohol concentration of 126 mg/dl corresponds to a blood alcohol concentration (BAC) of 0.110% on his blood sample collected at 4:00 AM.**

2) **Ray's BAC was 0.141% (range = 0.128% to 0.154%) at the time that the police reported that he was outwardly intoxicated at approximately 2:15 AM.** A more conservative analysis finds that Ray's BAC at that time was < 0.132% (range = 0.122% to 0.141%).

3) the BAC threshold whereby Ray would be expected to exhibit outward signs of intoxication was ≥ 0.15% and probably closer to 0.20%; therefore, **Ray's blood alcohol concentration was not consistent with or predictive of outward signs of intoxication as described by the police.**

4) Significant impairment of divided attention task skills has been demonstrated at blood alcohol concentrations in the 0.05 to 0.08% range and higher. Accordingly, **Risbin's level of intoxication (i.e., BAC 0.154%) was consistent with and predictive of impairment of divided attention tasks required to safely operate a motor vehicle, and consistent with his testimony that he was distracted by the police activities occurring in the vicinity as he traveled through the incident intersection.**

Michael J. McCabe, Jr., Ph.D., DABT, ATS

Robson Forensic
Engineers, Architects, Scientists & Fire Investigators

PLAINTIFF'S EXHIBIT 21 No. 13-1483

ARREST PROCEDURE

6. SPECIAL SITUATIONS
   a) In cases involving Retail Theft, if the involved party has been fingerprinted for some reason, the officer must note this on the citation form so that the fingerprint order card be sent to the officer. The fingerprint order card and fingerprint card must be forwarded to the state repository together.
   b) In cases involving Public Drunkenness, it is the responsibility of the arresting officer to contact an interested party to take charge of the defendants care and welfare. The officer may be compelled to detain the defendant for his own good and should follow the rules of criminal procedure until he either feels the person can take care of himself or until the time limitation expires. If possible the arresting officer may at his option transport the defendant to his/her residence.

7. RESTITUTION
   a) A restitution form must accompany the citation if any restitution is involved.

8. JUVENILES - NON TRAFFIC CITATIONS
   a) Parents must be notified if the juvenile is cited for under age drinking. This must be noted on the citation.

9. See PROSECUTION, pages 65-67.



PLAINTIFF'S EXHIBIT 22 No. 13-1483

**STUN DEVICES**

No officer will playfully, maliciously or intentionally use the unit against another individual unless in the performance of his duties and to gain control of a situation.

Display of power, except for test, playful use, thrusting motions and/or carelessness in the confines of the police station or any other structure is strictly forbidden. Violations of any of the above will result in disciplinary action.

1. The stun device can be used in the following situations:
   a) against animals such as dogs
   b) prior to an arrest in an effort to break resistance
   c) to break up a fight
   d) extensive crowd control
   e) to break resistance during the arrest process
   f) to facilitate a physical search
   g) to prevent officer injury
   h) to prevent civilian injury
   i) to calm a custody situation

2. The stun device will not be used in the following situations:
   a) against a handgun or other firearm
   b) against a knife
   c) to threaten or gain information from a subject
   d) against a subject already in custody unless physical resistance must be overcome
   e) to wake a suspected intoxicated individual
   f) as a "prod"

A. SELF DEFENSE

The stun device can and should be used in conjunction with self-defense of an officer. An officer must determine is he/she is in danger of bodily harm and to what degree to determine the level of force, lethal, non-lethal, verbal, compliance or control to be used. Upon determination, an officer must take appropriate action to control the situation and employ that force which is necessary.

B. USES / ARREST

The actual uses of the stun device will require an arrest be made. Simply a display of power in a "test arc" status will only require completing the optional compliance section of the report. It shall not be required or necessary to effect an arrest at that point and such an arrest will be at the officers discretion providing there is reasonable cause for an arrest.

   




## FORCE - NON DEADLY

The following is a force continuum listed in ascending order. This does not mean that an officer must proceed from the lowest level through each phase before using necessary force to control a situation, but that the officer should be aware of the levels and judge which is the most suitable and if it is effective under the circumstances that exist at the time.

A. PRESENCE: May bring compliance with the law or make the actor(s) vacate the area

B. VERBAL COMMANDS: Same as above or the actor(s) may follow specific directions.

C. RESTRAINT AND CONTROL: Stops the person(s) actions and make the situation safe for both the actor and officer.

1. Permitted
    - a) handcuffs
    - b) leg irons
    - c) non-metal cuffs
2. Prohibited
    - a) thumb cuffs
    - b) iron claw

D. NON-DEADLY FORCE: Force that the officer feels is necessary to stop the Actor(s) from harming the officer or another person. The officer may use an amount of force necessary to effect an arrest or to prevent injury.

Chemical Agents – (Refer to page #51)

Contact weapons:

1. Permitted
    - a) night stick
    - b) blackjack
    - c) sap gloves
    - d) PR-24 or side handled baton – must have received certificate of training
    - e) Stun device – must have received certification of training and only nova spirit, nova XL5000, Ultron and the Taser X26 are authorized
    - f) Kubaton
    - g) Expandable baton
2. Exceptions
    - a) Under exigent circumstances items other that those specified may be used.

PLAINTIFF'S EXHIBIT 24 No. 13-1483

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - -

JERRY L. RAY, Plaintiff,

-vs-

MICHAEL CAIN; an individual, JAMES MARKLEY, an individual; and CITY OF WASHINGTON, Defendants.

Civil Action No. CV13-01483-DSC

- - - -

DEPOSITION OF: KENNETH BOLLINGER

- - - -

DATE: March 26, 2015
Thursday, 11:52 a.m.

LOCATION: Washington City Hall
55 West Maiden Street
Washington, PA 15301

TAKEN BY: Plaintiff

REPORTED BY: JoAnn M. Brown, RMR, CRR
Notary Public
Reference No. JB37466A

those or did we ask you to use those parameters?
A. I selected those to make sure that I had enough buffer before and after the incident in question to see if I had received any other calls that might be related to the incident that we're discussing today.
Q. All right. And I direct you to the third page --
A. Right.
Q. -- and that says Event Summary across the top.
What are we looking at there, Mr. Bollinger?
A. This is the result of the query from the previous page, and this shows that the 911 center fielded a total of six incidents for the Washington City Police between 12:30 a.m. and 3 a.m. on October 16, 2011.
Q. Okay. And the incident that we're on here today initially started as a call as an intoxicated person, and do you see that call on this?
A. Yes, call number 5.
Q. Okay. And that's the one at 2:14:51 a.m.?
A. Yes.

Q. All right. And I notice on that document it says Unit 9032.
Is that the police unit?
A. That is the primary police unit that the call was assigned to.
Q. Okay. As we sit here today, do you have any knowledge of who that was assigned to that night?
A. Well, if I look through subsequent documents -- and I caution you this may or may not be accurate -- it shows that the employee was Badge No. 59 from the Washington City Police; however, what my records reflect is the last officer to log into Unit 9032, and sometimes, at shift change, the entire city police department doesn't log on duty with us. There may be moments when they change shifts from an earlier shift where they are extremely busy with calls and they're just doing whatever they can to respond to them and handle them, so it is possible that Badge 59 was not even on duty while this incident took place.
Q. Okay. And as we sit here, do you know who Badge 59 is?

A. No, I don't.
Q. All right. And then going backwards to the page before -- well, I guess, now we're on the fourth page, I think. This says Event Information.
What does this document reflect?
A. This is a shapshot of our CAD report that was generated from event number 5 on the previous page.
Q. Okay. And when you say CAD report, what does that mean?
A. Any time a police officer provides a 911 operator with information, we put it into a computer system, that computer-aided dispatch system. That's what the CAD represents. No matter how minor or how major it is, if we're made aware of a situation, we put it in the computer.
Q. And when you receive a call from an officer in the field, do you know who that officer is when they call in?
And what I mean by that, if they were to click on their radio and not say anything and click off, would you have any knowledge of who was trying to make that

transmission?
A. No.
Q. They'd have to physically identify themselves as this is Unit 9032?
A. Right, they're identifying the car that they're driving, but they're not necessarily identifying who they are personally.
Q. All right. So there's no identifier, what I'm getting at, on the police radio so that you know it is?
A. We do have those now, but not every police department participate in that program. They have to either update their radios or update the software in the radios to allow us to see that information. I would say, at this point, off the top of my head, half of the county police departments provide us with their quote/unquote caller ID whenever they key up their radio.
Q. So it's a fair statement, in 2011, this did not exist with the Washington City Police?
A. I believe it's fair to say that it did not exist then, and it still does not exist today.
Q. Okay. And as we look at this document then, there's a box here on the right that has a lot

of information in there.
Can you just kind of decipher what it is we're looking at and what it means?
A. Well, the box on the right is used in conjunction with all the other boxes in the field. What I can tell you by looking at this document and seeing this in my 20 years at the 911 center is that at 2:14 in the morning on February -- I'm sorry, on October 16, 2011, Police Unit 9032 made a transmission to the 911 center requesting that an incident be started or telling us that he was simply out on an intoxicated person at Jefferson and Chestnut in Washington.
Q. Okay. And that's the initial call.
Now, have you ever heard of a situation where a City of Washington police officer or officers have tried to transmit to the 911 call center and been unable to reach you?
A. That is possible.
Q. Have you ever known it to happen?
A. In the City of Washington, because of their proximity to our antennas at the 911 center, if it does happen, it could be because another

unit was also trying to talk at the same time. In our more remote police departments, it's possible that they key up the radio and we don't hear anything. Washington is close enough where if they transmit, we hear something. However, if two officers transmit, we get nothing but a garbled transmission that is unintelligible.
Q. And in terms of -- where is the call center? Where is it located?
A. The call center is located at the intersection of Beau and Franklin.
Q. And how close is that to the intersection of West Chestnut and Jefferson?
A. More relevant to that question would be where are antennas located in reference to Jefferson and Chestnut. The Washington City Police Department utilizes a radio system that has receiving antennas in Claysville Borough, in North Franklin Township, in the City of Washington, and in South Strabane Township.
Q. And the antenna in the City of Washington, do you know where it's located?
A. On the roof of Courthouse Square.
Q. Which is how far from Jefferson and West

Chestnut?
A. Three city blocks.
Q. Okay. And that antenna sits at the top of the courthouse?
A. Yes.
Q. And that's probably the highest point in the city or close to it?
A. It's close, but it's not the highest.
Q. All right. And then going down here, the initial call is for an intoxicated person. I then see that there's a request for EMS and helicopter, a vehicle hit by an intoxicated pedestrian.
Am I reading that correctly?
A. I don't see that as a vehicle was hit by an intoxicated pedestrian. I read that as an intoxicated pedestrian was struck by a vehicle.
Q. Okay. I misstated that. I apologize.
A. Okay. That's what I see, although -- there was a collision of some sort. I'm not sure maybe who hit who.
Q. Okay. And then it notes there's a case number assigned to it and it says for WCP PD56.
A. Mm-hmm.

Q. I know those are identifiers.
Can you tell us what that is?
A. Above the request for EMS and helicopter, you can see that a case number was assigned for WCP PD90. That means that immediately my dispatcher initiated a case number for PD90, which is the Washington City Police Department.
Below the intoxicated pedestrian comment, it states that my employee assigned a case number to WCP PD56. That would mean that she also created an incident number for the East Washington Borough Police Department.
Q. Okay. So PD56 represents the City of East Washington?
A. The Borough of East Washington, yes.
Q. Borough. Sorry.
A. Mm-hmm.
Q. Okay. And then it says MedEvac 1 home and available, going to LZ 5401 Shop N' Save back slash, back slash less than 5.
A. Correct.
Q. What does all that mean?
A. Whenever an individual police officer, firefighter, ambulance requests a helicopter,

assigned by the computer so that you can find it later?
A. That is correct.
Q. All right. And then it says Unit, or I guess --
A. Primary Unit.
Q. -- it's Primary Unit, yeah, and we have 5400. That's the base for Ambulance & Chair?
A. Correct.
Q. And then 9032 is the police unit that initiated the call?
A. That is correct.
Q. All right. Thank you.
Now I'd like to direct you to the event chronology, and as we look through this, this event chronology, it's done sequentially in time as calls come in, correct, or go out?
A. That is correct.
Q. All right. And these are recorded -- are they recorded automatically by the computer system, or do you guys have to hit a button to tell the computer to record it?
How does this record get generated?
A. All event chronologies are generated automatically by the computer-aided dispatch

system based on key strokes that are made by my employees.
Q. All right. So this event begins at 2:14:51, and we've already established that's the initial call for an intoxicated person and it's Unit 9032.
Is all that information accurate?
A. That is what it says, yes.
Q. Okay. And we think this might be Operator Debra Cadez?
A. Yes.
Q. 021, right?
A. Yes.
Q. All right. And at that point, this is a 6 in terms of how important a call is, how urgent, correct?
A. Correct.
Q. All right. And we see an LOI search, but that's in relation to the area where the call is coming from, Jefferson and Chestnut, correct?
A. That is correct.
Q. So it's looking for any important information related to that particular intersection?
A. That is correct.

Q. And it says: Supplemental Info Created: Vehicle; and then there's State, PA; License, 211.
Can you tell us what all that means?
A. Any time we put a call in, there's a field available to the 911 operator to enter a license plate related to the incident, be it for a traffic stop if the officer provides a license plate, or maybe it's a theft of gas from a convenience store that's in there. In order for it to work, initially when we got this system in 2008, the employee had to type in the state, Pennsylvania, the license year, which is the current year, the license type, be it a PC for a passenger car or a TK for a pick-up truck, and then type the digits of the plate in. We made some adjustments to our computer-aided dispatch system to default to Pennsylvania, 2011, and PC. So that information gets put in in every call, but if there's no plate associated with it, you'll see that there's no field that says plate equals and gives a plate, because we didn't put one in for this incident.
Q. All right. Because you're dealing with an

intoxicated individual, and that's a default line of information that if you have it, you're going to fill it in?
A. Correct.
Q. Okay. Then it goes on to 2:14:52. Unit, 9032. Status, AR. That means arrived?
A. That is correct.
Q. All right. And then it gives the location again, it gives the employee again, which is 90059, and you've already told us that may or may not be accurate.
A. That is correct.
Q. And we're still within the same time frame. It says Event Comment. It shows the case number that's been assigned. It shows the police unit. Well, actually, it says Washington City Police, and it says PD90, so that's the same identifier for Washington County Police, correct?
A. That is correct.
Q. All right. And then, in fact, it identifies your operator there as Debbie Cadez?
A. Yes, that is the person who created the incident number.
Q. All right. And what we just looked at over

that one second of entry, that's how any call would begin, all this information comes up, and the operator either deals with it or enters the information as information comes in?
A. That is correct. Had it been an actual 911 call, there would have been a lot more detailed information in there, but this was a non-view incident and she typed in what she needed to get it started.
Q. All right. And so once our event is started, we get a call then at -- well, actually, what is that at 2:14:59 a.m. from Debbie? It says Event Comment: Vehicle search completed at 10/16 at 2:14:59.
A. That actually could mean that it took eight seconds for the state to respond that the information provided in the call, which was the license plate, state, year and type, was not sufficient for the state to do a query on it because we didn't fill out a plate, and the state actually -- when we do this, it sends the information to Harrisburg, and then nine seconds later, Harrisburg probably automatically sent back that that's not enough

information, they would need a plate too, but that's the way our system is set up.
Q. So that's just an automatic response, there's not enough info here, so nothing?
A. Right.
Q. All right. And then it says at 2:16:46, Operator 91041.
Do you know who that is?
A. No, I don't.
Q. Okay. Looks like Operator 91041, is that operator getting a call from Unit 9031?
A. It appears to me that Operator 91041 overheard a transmission from Police Unit 9031 to add me to the call.
Q. Okay. And then that person is identified as Employee 90041?
A. Which may or may not be accurate.
Q. Okay. And this indicates Jefferson Avenue and West Chestnut Street.
Does that mean that this unit is at that location?
A. Well, at 2:16:46, Unit 9031 status DP means that we put them on the call at their request, but then again one second later, at 2:16:47, we marked them as arrived, which is a manual

process, so it would appear to me as if at some time after 2:16 he said 9031 will be out with 32, and we dispatched him to the call and immediately marked him on scene just like we did for the initial call.
Q. Okay. And just so the record is clear, does that mean he's physically at the scene then when this transmission is received?
A. That means that he told us he was at the scene.
Q. Okay. Now, prior to his arrival at the scene, I don't see any transmissions in here asking him to respond to the scene.
Is it possible that the police are able to communicate through their radios without the 911 call center hearing their transmissions?
A. They could talk on telephones. They may have their own private frequency that we're not aware of, although I don't believe that would be the case, or what I typically believe happens is, especially in the City of Washington, they're a tight group of individuals, and when one person calls out on something, if somebody else is close, they go

there too without being asked.
Q. Okay. So it's very possible that this officer heard the initial intox call and drove to the location?
A. That is correct.
Q. Okay. After he arrives at 2:17:26, approximately 30 seconds later give or take a few seconds --
A. That's correct.
Q. -- there's a call, looks like it's going to Debbie Cadez, and it says Event Comment: Request EMS and helicopter?
A. Correct.
Q. Okay. And then on the very next line, four seconds later, it says Event Comment: Vehicle hit intoxicated pedestrian?
A. That's correct.
Q. All right. What's your understanding of what that means?
A. I believe it to mean that the 911 operator was told that they need a helicopter and an ambulance there.
Q. Okay. That whatever the call was originally of just an intoxicated person, it now appears to have elevated to something very different?

Page 42

A. Yes, although I'm not sure if -- I'm not sure if he initially came across a staggering individual that then later a few minutes needed an ambulance or if he came across somebody who maybe he assumed was intoxicated and laying on the ground and said, oh, start me a number for an intox, and then he got out and looked and saw tire marks or something on his clothing and then decided that this was more than an intox and he needed -- but for some reason --
Q. The situation has changed?
A. -- an officer that was on scene told us that they needed a ambulance.
Q. The situation has changed, whatever has happened?
A. Yes.
Q. And it's fair to say you're not working that night, you're not at the scene, you have to rely on the information that you see in front of you?
A. That's correct.
Q. Okay. Now, I notice, too, when that call comes in, it doesn't have any identifiers as to who actually makes that call. It doesn't

Page 43

say an employee number or anything like that.
Would that be because the person that made that request didn't identify who it was, they just called for it?
A. Well, while that can happen that somebody just blurted out that they need an ambulance and a helicopter, in a situation like this, the 911 operator typically doesn't type in who asked for the information. She just manually typed in a comment request EMS and helicopter, and then she a few seconds later typed in vehicle hit an intoxicated pedestrian.
Q. Okay.
A. She didn't note at that point who made the request.
Q. Okay. And then at 2:18:31, it appears that the Borough of East Washington might now be on the scene. Look at those two calls at 2:18:31 and 2:18:32.
A. Yeah, that appears to mimic when Unit 9031 arrived on scene to back up Unit 9032. It appears that the East Washington Borough Police arrived on scene and said, start me an incident; I'll be out assisting the city.
Q. Okay. And do you know if East Washington can

Page 44

hear the transmissions of the Washington Police Department or is he hearing the 911 transmissions?
A. No, we all hear everything.
Q. Okay. So he may have done the same thing as the other unit, gone to the scene to help respond?
A. Yes, and I can tell you that East Washington does that a lot. As they're a one-man department, they sometimes get calls that can make them pucker, and the city is the first one there to assist them. So while the East Washington Borough Police Department isn't nearly as busy as the city, they try to keep themselves busy by helping the city as much as possible to reciprocate for the help that the city gives them. This isn't indicative that the city said, I need you to come and help me, it may just be that he showed up on his own.
Q. Okay. And then we move down the time line a little bit. At 2:19:33 -- well, actually, if we go up above that, there's a case number assigned.
Is that the same case number? Yeah, I guess it is.

Page 45

A. That shows that a case number was assigned for East Washington.
Q. And it's the same number?
A. Yes.
Q. So it's all the same event then?
A. Right.
Q. Okay. And then below that, at 2:19:33 it says Event Comment: MedEvac 1 home and available, going to the landing zone 5401 Shop N' Save, less than 5.
We've already talked about what that means.
A. Correct.
Q. So that's the call checking to see if they're available, and that's made at 2:19:33, correct?
A. Correct.
Q. All right. And I think we're familiar with -- we've covered some of this other information already.
A. Correct.
Q. And then there's some on here that I don't understand, like at 2:20:43 a.m. --
A. Okay.
Q. -- and it's from 91041 and there's a bunch of

Page 62

person the police officers do, so that person can say, you tell your 911 operator what the outcome of the call was, and the disposition will be in there.
In Washington County, we're not related in any way to the police departments we dispatch for. What they do on their end is their business and needs to be contained in the police reports, not in the 911 CAD report.
Q. So that's true of any kind of call that the Washington police would go on, you don't ever know the end result or hear about it unless somebody comes in and tells you?
A. That happens rarely that somebody would come in and tell us. Quite honestly, in 20 years, when we want to find out what happened on our calls last night, we got to read the paper.
Q. All right. And did you ever see an article in the paper about this incident?
A. No, I -- as a matter of fact, when you told me that somebody in custody got run over, it jogged my mind, because I never heard anything like that.
Q. It was in the paper.
A. Oh, sorry.

Page 63

Q. That's okay.
MR. HOUCK: We're going to take a real short break, okay, and then we'll be back in.
THE WITNESS: Okay.
- - - -
(There was a recess in the proceedings.)
- - - -
MR. HOUCK: Just a couple more questions.
BY MR. HOUCK:
Q. I direct your attention back to the event chronology real quick, and you can leave it on the first page. That's fine.
I didn't ask about the entries under the heading of Terminal.
Is that just the computer that the operator is sitting at?
A. That is correct.
Q. Okay. And then looking at that again where it says the opening of the call intoxicated person, there's no information in there about the person is injured, the person is walking across the intersection, it's just intoxicated person?

Page 64

A. That's correct. That's not to say that my employee wasn't provided with an initial summary of what the officer was seeing, but that was the information she put in the computer to generate his incident at the most accurate time possible.
Q. All right. And it's fair to say that if he or she wanted to type more information into that area, they could?
A. Yes, they could.
Q. And you would agree that the very first report of any injury at this scene is when they call for the EMS and the helicopter at 2:17:26?
A. That was the first time that anyone at our 911 center was aware that this was more than an intoxicated person.
Q. Okay. And then actually it says: Vehicle hit intoxicated pedestrian.
That's evidence of an injury?
A. Correct, and that was 14 seconds later, and I can tell you from experience, especially if it was Debbie Cadez, she immediately updated the call to add an ambulance to it, and then said -- because a lot of times an officer will say, I need an ambulance. If we dispatch an

Page 65

ambulance and, say, the police need an ambulance, the first question the ambulance will ask us is, what for? So I have no doubt in my mind that she was told she needed an ambulance, she clicked on it to send an ambulance, and then got back on the radio and then said, what do you need an ambulance for, and maybe got the response with a vehicle hit an intoxicated pedestrian, maybe.
Q. And you would agree that looking at that, that's the only entry of a mechanism of injury on this call? That's it? There's not one prior to that?
A. I would agree.
MR. HOUCK: Okay. I don't think I have anything further.
MR. CAMBEST: I have no questions.
MR. HOUCK: Mr. Bollinger, you have the right to review this transcript for its accuracy or you can waive your signature.
THE WITNESS: I'll waive.
MR. HOUCK: Okay. All done.
- - - -
(Thereupon, the deposition was concluded at 1:05 p.m.)



PLAINTIFF'S
EXHIBIT
25
No. 13-1483

# THE CITY OF WASHINGTON
# POLICE DEPARTMENT

## CRIMINAL INVESTIGATION REPORT

**INVESTIGATOR:** Lt. Daniel Stanek **CRIME:** D.U.I. Accident - Risbin

**REPORT DATE:** 10/17/11 **INCIDENT NO:** 11008941

**VICTIM(S):** Jerry Ray **LOCATION:** Jefferson Ave @ W Chestnut St

**INFORMATION SOURCE:** Investigation

This officer was contacted by Lt John Yancosek on this date at approximately 0300 hrs. Yancosek advised that there was a motor vehicle accident involving a pedestrian at the above listed location. Yancosek requested assistance from this officer.

Upon arrival at the City of Washington Police Department, this officer was further briefed on the incident by Lt. Yancosek. Yancosek advised that an individual identified as Jerry Ray, was struck by a vehicle while he was lying in the roadway. The operator was in custody for suspicion of driving under the influence. The operator was identified as James Risbin. A blood sample was collected at the Washington Hospital for analysis to determine if Risbin was under the influence of alcohol or drugs at the time of the accident. Yancosek further advised that two of our officers, Ptlm. James Markley and Ptlm. John Cain, were in the process of assisting Ray, whom they had discovered while patrolling, lying in the roadway, when he was struck.

This officer interviewed Markley in the presence of Yancosek. Markley advised me that he had encountered Ray lying in the intersection while on routine patrol. Markley was traveling east on W Chestnut St and as he approached the intersection with Jefferson Ave, noticed Ray after seeing two vehicles have to slow and go around him. As Markley and Cain exited the patrol vehicle, Ray got up and continued from the southwest intersection towards the northeast intersection. Ray appeared intoxicated and showed no obvious signs of being injured. Ray was also making movements towards his front waistline. As Ray neared the northeast intersection, he turned and fell onto the roadway. Markley approached Ray and handcuffed him for safety. As he tried to lift Ray off of the roadway, he directed Cain to signal with his flashlight any oncoming traffic as their patrol vehicle was still on the other side of the intersection where they had exited it. Cain briefly used his flashlight and then started across the intersection to get the patrol vehicle and moved it over to the northeast intersection to provide warning and protection to Ray and Markley as Markley struggle to move the larger Ray from the roadway. Markley advised that as this was occurring he was giving Ray verbal commands to help Markley get him up. As this was occurring, Markley noticed headlights approaching in the northbound lane of Jefferson Ave. As the vehicle approached, Markley's actions became more urgent. He also began to fear for his safety as it appeared the vehicle was not slowing. In one final attempt, he tried unsuccessfully to pull Ray off of the roadway. Markley then had to jump from the path of the approaching vehicle as it struck Ray, running over top of him. Markley immediately went back to assist Ray and called for medical help. The vehicle that struck Ray continued north for approximately half of a block before backing up and returning to the scene.

Yancosek then advised that the vehicle was still in the location the operator had stopped at, along with any physical evidence that was left at the scene. I accompanied Yancosek to the scene and met with Sgt Sulerud, who had been maintaining the scene. Sulerud briefed this officer on the scene and advised me that he had already photographed the scene. This officer reviewed the photographed and determined several other photos should be taken. Sulerud completed this task. Due to the vehicle's

Δ π EXHIBIT 7
Deponent Stanek
Date 5-6-15 Rptr. JB
WWW.DEPOBOOK.COM

location not being at final rest, its location was only documented with photographs. The victim's clothes that remained at the scene, along with several pieces of debris from the vehicle were collected at this time. Additionally the handcuffs that were on Ray were collected and will be submitted with the evidence. Yancosek was in possession of those as he had removed them from Ray when he arrived on scene.

The vehicle, a Kia Soul, was impounded at Isimingers and will be photographed on Monday morning before being released.

PLAINTIFF'S EXHIBIT 26
No. 13-1483

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 1

Case Closed: Yes (checked) / No
Reportable Crash: Yes (checked) / No
Page: 1

W0241130

**1 Police Agency Data**

| Field | Value |
|---|---|
| Incident Number | 11008941 |
| Police Agency | 62302 |
| Patrol Zone | 100 |
| Agency Name | Washington City |
| Precinct | |
| Investigation Date (MM-DD-YYYY) | 10-16-2011 |
| Dispatch Time (mil) | 0214 |
| Arrival Time (mil) | 0215 |
| Investigator | MICHAEL CAIN |
| Badge Number | 062 |
| Reviewer | RITA M SMITH |
| Badge Number | |
| Approval Date (MM-DD-YYYY) | 10-20-2011 |

**2 Crash Data**

| Field | Value |
|---|---|
| County | 62 |
| County Name | Washington |
| Municipality | 302 |
| Municipality Name | Washington City |
| Day of Week | Sun (checked) |
| Crash Date (MM-DD-YYYY) | 10-16-2011 |
| Crash Time (mil) | 0214 |
| No of Units | 2 |
| People | 2 |
| Injured | 1 |
| Killed* | 0 |
| *If > 80 complete Form F | |
| Workzone (If Yes, Complete Form M, Section 29) | No |
| School Bus Related | No |
| School Zone Related | No |
| Notify PENNDOT Maintenance | No |

**3 Loc Type**

Intersection Type: 4 Way Intersection (checked). Options: Midblock, 4 Way Intersection, "T" Intersection, "Y" Intersection, Traffic Circle/Round About, Multi-Leg Intersection, On Ramp, Off Ramp, Crossover, Railroad Crossing, Other

*Special Location: 00 — * See Overlay

**4 Principal Road**

| Field | Value |
|---|---|
| Route Number | |
| Segment (Optional) | |
| Travel Lanes | 04 |
| Speed Limit | 25 |
| Street Name | JEFFERSON |
| Street Ending | AV |
| Orientation | North (checked) |
| House Number (if applicable) | |
| Route Signing | Local Road or Street (checked) |

For Mid-block crashes only. Use postal House Number and make sure Principal Roadway Street Name is filled in if using this option

**5 Intersecting Road** (Use for Intersection Crashes)

| Field | Value |
|---|---|
| Route Number | |
| Segment (Optional) | |
| Travel Lanes | 02 |
| Speed Limit | 25 |
| Street Name | CHESTNUT |
| Street Ending | ST |
| Orientation | West (checked) |
| Route Signing | Local Road or Street (checked) |

**6 Distance From Landmark** (Use for Mid-Block Crashes)

Please Enter Information for BOTH Landmarks if Using This Option

Landmark 1: Intersecting Rt Num Or Mile Post / Or Segment Marker / Or Intersecting Street Name / St Ending / Ramp Use Only: North, South, East, West — (blank)

Landmark 2: Intersecting Rt Num Or Mile Post / Or Segment Marker / Or Intersecting Street Name / St Ending / Ramp Use Only: North, South, East, West — (blank)

Feet: / Or Miles: — Distance From Crash Scene to Landmark 1 (For Crash between Landmark 1 and Landmark 2)

**7 GPS**

Latitude: Degrees / Minutes / Seconds — (blank)
Longitude: — Degrees / Minutes / Seconds — (blank)

**8 TCD**

Traffic Control Device: Traffic Signal (checked). Options: Not Applicable, Flashing Traffic Signal, Traffic Signal, Stop Sign, Yield Sign, Active RR Crossing Controls, Passive RR Crossing Controls, Police Officer or Flagman, Other Type TCD, Unknown

TCD Functioning: Device Functioning Properly (checked). Options: No Controls, Device Not Functioning, Device Functioning Improperly, Device Functioning Properly, Emergency Preemptive Signal, Unknown

**9 Lane Closure**

Lane Closed (If "Not Applicable", skip rest of the Lane Closure section): Partially (checked)
Lane Closure Direction: North (checked)
Traffic Detoured: Yes (checked)
Est. Time Closed: 30-60 Min. (checked)

FORM # AA-500 (12/02)

PENNDOT COPY

EXHIBIT CAIN 17

http://www.dot6.state.pa.us/crsapp/PrintImages/XmlFiles/2011106362201110211136513... 10/21/2011

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 2 | Police Use Only | Page: 2 | Crash Number W0241130

**Unit Info**
Type Unit: (filled) Motor Vehicle in Transport; ○ Hit & Run Vehicle; ○ Illegally Parked; ○ Legally Parked; ○ Non - Motorized; ○ Pedestrian; ○ Pedestrian on Skates, in Wheelchair, etc; ○ Disabled From Previous Crash; ○ Train; ○ Phantom Vehicle
(If "Pedestrian" or "Pedestrian on Skates, in Wheelchair, etc", Complete Form M, Section 28)
Commercial Vehicle: ○ Yes (filled) No (If Yes, Complete Form Q)

**Vehicle Driver / Pedestrian Information**
Unit No: 01
First Name: JAMES
MI: M
Date of Birth (MM-DD-YYYY):
Delete? ○
Last Name: RISBIN
Telephone Number:
Address / City / State: 740 MICHIGAN AVE APT WASHINGTON PA
Zip: 15301
Driver License Number: 18344858
State: PA
Class: AM*

Alcohol/Drugs Suspected: ○ No; ○ Illegal Drugs; ○ Medication; (filled) Alcohol; ○ Alcohol and Drugs; ○ Unknown
Driver or Pedestrian Physical Condition: ○ Apparently Normal; ○ Illegal Drug Use; ○ Fatigue; ○ Medication; (filled) Had Been Drinking; ○ Sick; ○ Asleep; ○ Unknown
Alcohol Test Type: ○ Test Not Given; ○ Breath; ○ Other; (filled) Blood; ○ Urine; ○ Unknown if Test Given
Primary Vehicle Code Violation: 3802
Charged? ○ Yes ○ No
Alcohol Test Results: 0. ; ○ Test Refused; (filled) Unknown Results; ○ Test Given, Contaminated Results
Driver Presence: 1 (1=Driver Operated Vehicle; 2=No Driver; 3=Driver Fled Scene; 4=Hit and Run; 9=Unknown)
Owner/Driver: 01 (00=Not Applicable; 01=Private Vehicle Owned/Leased by Driver; 02=Private Vehicle Not Owned/Leased by Driver; 03=Rented Vehicle; 04=State Police Vehicle; 05=PENNDOT Vehicle; 06=Other State Gov Veh; 07=Municipal Police Veh; 08=Other Municipal Government Vehicle; 09=Federal Gov Veh; 98=Other; 99=Unknown)

**Vehicle Information**
Same as Driver ○
Owner First Name: JAMES
Owner Last Name or Business Name (If Pedestrian, skip this Section): RISBIN
Address / City / State / Zip: 740 MICHIGAN AVE APT WASHINGTON PA 15301
Vehicle Make: KIA
*Make Code: 63
VIN: KNDJT2A25A7039358
Model Year: 2010
Vehicle Model: (see overlay)
License Plate: FWH7382
Reg. State: PA
Est. Speed: 999
Vehicle Towed: (filled) Yes ○ No
Towed By: ISMINGERS
Insurance: (filled) Yes ○ No ○ Unknown
Insurance Company: TRAVCO INSURANCE
Policy No: 983494783 101 1

Trailing Unit: No. of Trailing Units: 0
Type Unit: (1=Towing Pass. Veh; 2=Towing Truck; 3=Towing Utility Trailer; 4=Mobile/Modular Home; 5=Camper; 6=Full Trailer; 7=Semi-Trailer; 8=Other; 9=Unknown)
Tag No / Tag Year / Tag St:

Direction of Travel: N
*Vehicle Position: 01
*Movement: 01
*See Overlay

Special Usage: 00 (00=Not Applicable; 01=Fire Veh; 02=Ambulance; 03=Police; 08=Other Emergency Vehicle; 11=Pupil Transport; 12=Commercial Passenger Carrier; 13=Taxi; 21=Tractor Trailer; 22=Twin Trailer; 23=Triple Trailer; 31=Modified Veh; 99=Unknown)

Vehicle Color: 09 (01=Blue; 02=Red; 03=White; 04=Green; 05=Black; 06=Yellow; 07=Silver; 08=Gold; 09=Brown; 10=Orange; 11=Purple; 12=Other; 99=Unknown)

Vehicle Type: 06 (01=Automobile; 02=Motorcycle; 03=Bus; 04=Small Truck; 05=Large Truck; 06=SUV; 07=Van; 10=Snowmobile; 11=Farm Equip; 12=Construction Equip; 13=ATV; 18=Other Type Spec Veh; 19=Unk. Type Spec Veh; 20=Unicycle, Bicycle, Tricycle; 21=Other Pedalcycle; 22=Horse & Buggy; 23=Horse & Rider; 24=Train; 25=Trolley; 98=Other; 99=Unknown)
(If "02", Complete Form M, Section 26)
(If "20" or "21", Complete Form M, Section 27)

Initial Impact Point: 01 (00=Non-Collision; 01-12=Clock Points; 13=Top; 14=Undercarriage; 15=Towed Unit; 99=Unknown)
Damage Indicator: 1 (0=None; 1=Minor; 2=Functional; 3=Disabling; 9=Unknown)
Gradient: 1 (1=Level; 2=Uphill; 3=Downhill; 4=Bottom of Hill; 5=Top of Hill; 9=Unknown)
Road Alignment: 1 (1=Straight; 2=Curved; 9=Unknown)

FORM # AA-500 (12/08)

PENNDOT COPY

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 2 | Police Use Only | Page: 3 | Crash Number W0241130

**Unit Info**

Type Unit: ○ Motor Vehicle in Transport ○ Hit & Run Vehicle ○ Illegally Parked ○ Legally Parked ○ Non - Motorized ● Pedestrian ○ Pedestrian on Skates, in Wheelchair, etc ○ Disabled From Previous Crash ○ Train ○ Phantom Vehicle

(If "Pedestrian" or "Pedestrian on Skates, in Wheelchair, etc", Complete Form M, Section 28)

Commercial Vehicle: ○ Yes ● No (If Yes, Complete Form C)

**Vehicle Driver / Pedestrian Information**

Unit No: 02
First Name: JERRY
MI:
Date of Birth (MM-DD-YYYY):
Delete? ○
Last Name: RAY
Telephone Number:
Address / City / State: 133 WABASH ST. PITTSBURGH PA
Zip: 15220
Driver License Number:
State:
Class:

Alcohol/Drugs Suspected: ○ No ● Alcohol ○ Illegal Drugs ○ Alcohol and Drugs ○ Medication ○ Unknown

Driver or Pedestrian Physical Condition: ○ Apparently Normal ● Had Been Drinking ○ Illegal Drug Use ○ Sick ○ Fatigue ○ Asleep ○ Medication ○ Unknown

Alcohol Test Type: ● Test Not Given ○ Blood ○ Breath ○ Urine ○ Other ○ Unknown if Test Given

Primary Vehicle Code Violation:
Charged? ○ Yes ● No

Alcohol Test Results: 0. ○ Test Refused ○ Test Given, Contaminated Results ○ Unknown Results

Driver Presence: 1=Driver Operated Vehicle 2=No Driver 3=Driver Fled Scene 4=Hit and Run 9=Unknown

Owner/Driver: 00=Not Applicable 01=Private Vehicle Owned/ Leased by Driver 02=Private Vehicle Not Owned/Leased by Driver 03=Rented Vehicle 04=State Police Vehicle 05=PENNDOT Vehicle 06=Other State Gov Veh 07=Municipal Police Veh 08=Other Municipal Government Vehicle 09=Federal Gov Veh 98=Other 99=Unknown

**Vehicle Information**

Same as Driver ○
Owner First Name:
Owner Last Name or Business Name (If Pedestrian, skip this Section)
Address / City / State / Zip:
Vehicle Make: No Entry Made
*Make Code:
VIN:
Model Year:
Vehicle Model: (see overlay)
License Plate:
Reg. State:
Est. Speed:
Vehicle Towed: ○ Yes ○ No
Towed By:
Insurance: ○ Yes ○ No ○ Unknown
Insurance Company:
Policy No:

Trailing Unit: No. of Trailing Units:
Type Unit: 1=Towing Pass. Veh 2=Towing Truck 3=Towing Utility Trailer 4=Mobile/Modular Home 5=Camper 6=Full Trailer 7=Semi-Trailer 8=Other 9=Unknown
Tag No: Tag Year: Tag St:

Direction of Travel: *Vehicle Position: *Movement: *See Overlay

Special Usage: 00=Not Applicable 01=Fire Veh 02=Ambulance 03=Police 08=Other Emergency Vehicle 11=Pupil Transport 12=Commercial Passenger Carrier 13=Taxi 21=Tractor Trailer 22=Twin Trailer 23=Triple Trailer 31=Modified Veh 99=Unknown

Vehicle Color: 01=Blue 02=Red 03=White 04=Green 05=Black 06=Yellow 07=Silver 08=Gold 09=Brown 10=Orange 11=Purple 12=Other 99=Unknown

Vehicle Type: 01=Automobile 02=Motorcycle 03=Bus 04=Small Truck 05=Large Truck 06=SUV 07=Van 10=Snowmobile 11=Farm Equip 12=Construction Equip 13=ATV 18=Other Type Spec Veh 19=Unk. Type Spec Veh 20=Unicycle, Bicycle, Tricycle 21=Other Pedalcycle 22=Horse & Buggy 23=Horse & Rider 24=Train 25=Trolley 98=Other 99=Unknown
(If "02", Complete Form M, Section 26)
(If "20" or "21", Complete Form M, Section 27)

Initial Impact Point: 00=Non-Collision 01-12=Clock Points 13=Top 14=Undercarriage 15=Towed Unit 99=Unknown

Damage Indicator: 0=None 1=Minor 2=Functional 3=Disabling 9=Unknown

Gradient: 1=Level 2=Uphill 3=Downhill 4=Bottom of Hill 5=Top of Hill 9=Unknown

Road Alignment: 1=Straight 2=Curved 9=Unknown

FORM # AA-500 (12/02)

PENNDOT COPY

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 3 | Police Use Only | Page 4 | Crash Number W0241130

**People Information**

A Person Type:
1=Driver
2=Passenger
7=Pedestrian
8=Other
9=Unknown

B Sex:
F=Female
M=Male
U=Unknown

C Injury Severity:
0=Not Injured
1=Killed
2=Major Injury
3=Moderate Injury
4=Minor Injury
8=Injury, Unk Severity
9=Unknown if Injury

D Seat Position:
00=Not A Passenger/Occupant
01=Driver - All Vehicles
02=Front Seat Middle Position
03=Front Seat Right Side
04=Second Row - Left Side Or Motorcycle Passenger
05=Second Row - Middle Position
06=Second Row - Right Side
07=Third Row Or Greater - Left Side
08=Third Row Or Greater - Middle Position
09=Third Row Or Greater - Right Side
10=Sleeper Section of Truckcab
11=In Other Enclosed Passenger Or Cargo Area
12=In Open Area (Back Of Pickup, Etc.)
13=Trailing Unit
14=Riding On Vehicle Exterior
15=Bus Passenger
98=Other
99=Unknown

E Safety Equipment One:
00=None Used / Not Applicable
01=Shoulder Belt Used
02=Lap Belt Used
03=Lap And Shoulder Belt Used
04=Child Safety Seat Used
05=Motorcycle Helmet Used
06=Bicycle Helmet Used
10=Safety Belt Used Improperly
11=Child Safety Seat Used Improperly
12=Helmet Used Improperly
90=Restraint Used, Type Unknown
99=Unknown

F Safety Equipment Two:
00=None Used / Not Applicable
01=Front Air Bag Deployed (For This Seat)
02=Side Air Bag Deployed (For This Seat)
03=Other Type Air Bag Deployed
04=Multiple Air Bags Deployed
05=Motorcycle Eye Protection
06=Bicyclist Wearing Elbow/Knee/Pads
10=Air Bag Not Deployed, Switch On
11=Air Bag Not Deployed, Switch Off
12=Air Bag Not Deployed, Unk Switch Setting
13=Air Bag Removed (Prior To Crash)
19=Unknown If Air Bag Deployed
99=Unknown

G Ejection:
0=Not Applicable
1=Not Ejected
2=Totally Ejected
3=Partially Ejected
9=Unknown

H Ejection Path:
0=Not Ejected / Not Applicable
1=Through Side Door Opening
2=Through Side Window
3=Through Windshield
4=Through Back Door
5=Through Back Door Tailgate Opening
6=Through Roof Opening (Sunroof/ Convertible Top Down)
7=Through Roof Opening (Convertible Top Up)
9=Unknown

I Extrication:
0=Not Applicable
1=Not Extricated
2=Extricated By Mechanical Means
3=Freed By Non - Mechanical Means
8=Other
9=Unknown

EMS Agency: WASHINGTON AMBULANCE | Medical Facility: MERCEY HOSPITAL

| Unit No | Person No | Delete? | Date of Birth (MM-DD-YYYY) | A | B | C | D | E | F | G | H | I | Same as Operator | Name / Address / Phone | EMS Transport |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 01 | ☐ | ( - - | 1 | M | 0 | 01 | 03 | 00 | 0 | 0 | 0 | ☐ | RISBIN, JAMES M 740 MICHIGAN AVE APT WASHINGTON PA 15301 | No |
| 02 | 01 | ☐ | - ( - | 7 | M | 2 | 00 | 00 | 00 | 0 | 0 | 0 | ☐ | RAY, JERRY 133 WABASH ST. PITTSBURGH PA 15220 | Yes |
| | | ☐ | - - | | | | | | | | | | ☐ | | ○ Yes ○ No |
| | | ☐ | - - | | | | | | | | | | ☐ | | ○ Yes ○ No |
| | | ☐ | - - | | | | | | | | | | ☐ | | ○ Yes ○ No |
| | | ☐ | - - | | | | | | | | | | ☐ | | ○ Yes ○ No |

FORM # AA-500 (12/02)

PENNDOT COPY

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 4 — Police Use Only — Page 5 — Crash Number W0241130

**General Crash Information** (If more than 2 Units only complete once)

| Field | Value | Codes |
|---|---|---|
| Crash Description | 8 | 0=Non-Collision; 1=Rear End; 2=Head On; 3=Rear to Rear (Backing); 4=Angle; 5=Sideswipe (Same Direction); 6=Sideswipe (Opposite Direction); 7=Hit Fixed Object; 8=Hit Pedestrian; 9=Other/Unknown |
| Relation to Roadway | 1 | 1=On Travel Lanes; 2=Shoulder; 3=Median; 4=Roadside; 5=Outside Trafficway; 6=In Parking Lane; 7=Gore (Ramp Intersection); 9=Unknown |
| Illumination | 3 | 1=Daylight; 2=Dark - No Street Lights; 3=Dark - Street Lights; 4=Dusk; 5=Dawn; 6=Dark - Unknown Roadway Lighting; 8=Other |
| Weather Conditions | 1 | 1=No Adverse Conditions; 2=Rain; 3=Sleet (Hail); 4=Snow; 5=Fog; 6=Rain & Fog; 7=Sleet & Fog; 8=Other; 9=Unknown |
| Road Surface Conditions | 0 | 0=Dry; 1=Wet; 2=Sand, Mud, Dirt, Oil; 3=Snow Covered; 4=Slush; 5=Ice; 6=Ice Patches; 7=Water - Standing or Moving; 8=Other |

**Unit(s) Event Information**

Please Put Events in Sequential Order

| Unit No | # | Harm Event | L/R | Most? | Utility Pole Number |
|---|---|---|---|---|---|
| 01 | 1 | 02 | | ● | |
| | 2 | | | ○ | |
| | 3 | | | ○ | |
| | 4 | | | ○ | |
| 02 | 1 | 11 | | ● | |
| | 2 | | | ○ | |
| | 3 | | | ○ | |
| | 4 | | | ○ | |

Harmful Events (Harm Event)
01=Hit Unit 1
02=Hit Unit 2
03=Hit Unit 3
04=Hit Unit 4
05=Hit Unit 5
06=Hit Other Traffic Unit
07=Hit Deer
08=Hit Other Animal
09=Collision With Other Non Fixed Object
11=Struck By Unit 1
12=Struck By Unit 2
13=Struck By Unit 3
14=Struck By Unit 4
15=Struck By Unit 5
16=Struck By Other Traffic Unit
21=Hit Tree Or Shrubbery
22=Hit Embankment
23=Hit Utility Pole
24=Hit Traffic Sign
25=Hit Guard Rail
26=Hit Guard Rail End
27=Hit Curb
28=Hit Concrete Or Longitudinal Barrier
29=Hit Ditch
30=Hit Fence Or Wall
31=Hit Building
32=Hit Culvert
33=Hit Bridge Pier Or Abutment
34=Hit Parapet End
35=Hit Bridge Rail
36=Hit Boulder Or Obstacle On Roadway
37=Hit Impact Attenuator
38=Hit Fire Hydrant
39=Hit Roadway Equipment
40=Hit Mail Box
41=Hit Traffic Island
42=Hit Snow Bank
43=Hit Temporary Construction Barrier
48=Hit Other Fixed Object
49=Hit Unknown Fixed Object
50=Overturn/Roll Over
51=Struck By Thrown Or Falling Object
52=Pot Holes Or Other Pavement Irregularities
53=Jackknife
54=Fire In Vehicle
58=Other Non-Collision
99=Unknown Harmful Event

**Contributing Information**

| First Harmful Event in the Crash — Unit No | Harm Event | Most Harmful Event in the Crash — Unit No | Harm Event |
|---|---|---|---|
| 01 | 02 | 01 | 02 |

Do not repeat this information on multiple pages

Environmental / Roadway Potential Factors (E/R): 1: 00; 2: ; 3:

00=None
01=Windy Conditions
02=Sudden Weather Conditions
03=Other Weather Conditions
04=Deer In Roadway
05=Obstacle On Roadway
06=Other Animal In Roadway
07=Glare
08=Work Zone Related
11=Slippery Road Conditions (Ice/Snow)
12=Substance On Roadway
13=Potholes
14=Broken Or Cracked Pavement
15=TCD Obstructed
16=Soft Shoulder Or Shoulder Drop Off
28=Other Roadway Factor
29=Other Environmental Factor
99=Unknown

Possible Vehicle Failures (V)
00=None
01=Tires
02=Brake System
03=Steering System
04=Suspension
05=Power Train
06=Exhaust
07=Headlights
08=Signal Lights
09=Other Lights
10=Horn
11=Mirrors
12=Wipers
13=Driver Seating/Control
14=Body, Doors, Hood, Etc.
15=Trailer Hitch
16=Wheels
17=Airbags
18=Trailer Overloaded
19=Unsecure/Shifted Trailer Load
20=Improper Towing
21=Obstructed Windshield
99=Unknown

| Unit No | 1 | 2 |
|---|---|---|
| 01 | 00 | |
| 02 | 00 | |

Driver Action (D)
00=No Contributing Action
01=Driver Was Distracted
02=Driving Using Hand Held Phone
03=Driving Using Hands Free Phone
04=Making Illegal U-Turn
05=Improper/Careless Turning
06=Turning From Wrong Lane
07=Proceeding W/O Clearance After Stop
08=Running Stop Sign
09=Running Red Light
10=Failure To Respond To Other Traffic Control Device
11=Tailgating
12=Sudden Slowing/Stopping
13=Illegally Stopped On Road
14=Careless Passing Or Lane Change
15=Passing In No Passing Zone
16=Driving The Wrong Way On 1-Way Street
17=Careless Or Illegal Backing On Roadway
18=Driving On The Wrong Side Of Road
19=Making Improper Entrance To Highway
20=Making Improper Exit From Highway
21=Careless Parking/Unparking
22=Over/Under Compensation At Curve
23=Speeding
24=Driving Too Fast For Conditions
25=Failure To Maintain Proper Speed
26=Driver Fleeing Police (Pol Chase)
27=Driver Inexperienced
28=Failure To Use Specialized Equip
92=Affected By Physical Condition
98=Other Improper Driving Actions
99=Unknown

| Unit No | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| 01 | 01 | | | |
| 02 | | | | |

Indicated Prime Factor — Do not repeat this information on multiple pages.
E/R ○ V ○ D ● P ○

| Unit No | Factor Code |
|---|---|
| 01 | 01 |

If E/R is the Prime Factor Type, leave Unit No blank

Pedestrian Action (P)
00=None
01=Entering Or Crossing At Specified Location
02=Walking, Running, Jogging, Or Playing
03=Working
04=Pushing Vehicle
05=Approaching Or Leaving Vehicle
06=Working On Vehicle
07=Standing
98=Other
99=Unknown

Unit No 01: ; Unit No 02: 98

FORM # AA-500 (12/02)

PENNDOT COPY

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 5

Police Use Only

Page 6

Crash Number W0241130

Diagram

Witness and Narrative

| Witness Name | Address | Phone |
|---|---|---|
| 1 | | |
| 2 | | |

Narrative and additional witnesses: Accident Investigation Notification Issued? ◯ Property Damage ◯

Unit #1 traveling north bound on Jefferson Ave. struck unit #2 who was handcuffed in police custody lying in the right travel lane. Unit #3 a police officer who got out of roadway as unit #1 struck unit #2.

FORM # AA-500 (12/02)

PENNDOT COPY

COMMONWEALTH OF PENNSYLVANIA
POLICE CRASH REPORTING FORM

AA 500 M

Police Use Only

Page 7

New

Change/ Continuation

Crash Number W0241130

**Motorcycle**

Unit No

For Answers to the below (except for Engine Size and Helmet Type) use the following codes: Y = Yes N = No U = Unknown

Engine Size: CC

Motorcycle Has? The Driver Has?

- Passenger
- MC Education
- Saddle Bag and/ or Trunk
- Trailer

Driver Protection ?

- Eye Protection
- Long Sleeves
- Long Pants
- Over Ankle Boots

Helmet Type
0 = No Helmet
1 = Full Helmet
2 = 3/4 Style
3 = Half Helmet Style
9 = Unknown

- Helmet Stay On?
- Helmet has DOT or Snell Designation

Passenger Protection ?

- Eye Protection
- Long Sleeves
- Long Pants
- Over Ankle Boots

Helmet Type
0 = No Helmet
1 = Full Helmet
2 = 3/4 Style
3 = Half Helmet Style
9 = Unknown

- Helmet Stay On?
- Helmet has DOT or Snell Designation

**Pedalcycles**

Unit No

Use Codes
Y = Yes
N = No
U = Unknown

- Passenger?
- Helmet?
- Head Lights?
- Rear Reflectors?

Unit No

Use Codes
Y = Yes
N = No
U = Unknown

- Passenger?
- Helmet?
- Head Lights?
- Rear Reflectors?

**Pedestrian**

Unit No 02

Pedestrian Location 05

Pedestrian Signals
- ● Yes
- ○ No
- ○ Not at Intersection

Pedestrian Clothing
- ○ Light
- ● Dark
- ○ Reflective
- ○ Unknown

01 = Marked Crosswalks at Intersection
02 = At Intersection - No Crosswalks
03 = Non-Intersection Crosswalks
04 = Driveway Access
05 = In Roadway
06 = Not in Roadway
07 = Median
08 = Island
09 = Shoulder
10 = Sidewalk
11 = < 10 Feet Off Road
12 = > 10 Feet Off Road
13 = Outside Trafficway
14 = Shared Paths/Trails
99 = Unknown

Unit No

Pedestrian Location

Pedestrian Signals
- ○ Yes
- ○ No
- ○ Not at Intersection

Pedestrian Clothing
- ○ Light
- ○ Dark
- ○ Reflective
- ○ Unknown

01 = Marked Crosswalks at Intersection
02 = At Intersection - No Crosswalks
03 = Non-Intersection Crosswalks
04 = Driveway Access
05 = In Roadway
06 = Not in Roadway
07 = Median
08 = Island
09 = Shoulder
10 = Sidewalk
11 = < 10 Feet Off Road
12 = > 10 Feet Off Road
13 = Outside Trafficway
14 = Shared Paths/Trails
99 = Unknown

**Work Zone**

Work Zone Type
- ○ Construction (Long Term)
- ○ Maintenance (Short Term)
- ○ Utility Company
- ○ Other

Where in Work Zone ?
- ○ Before 1st Work Zone Warning Sign
- ○ Advance Warning Area
- ○ Transition Area
- ○ Activity Area
- ○ Termination Area
- ○ Other

Work Zone Speed or Advisory Limit

Workers Present
- ○ Yes
- ○ No
- ○ Unknown

Law Enforcement Officer Present
- ○ Yes
- ○ No
- ○ Unknown

Special Work Zone Characteristics

*(Mark all that apply. If not involved or unknow, leave blank)*

- Lane Closure?
- Road Closed with Detour?
- Work on Shoulder or Median?
- Intermittent or Moving Work?
- Flagger Control?
- Other

List all Warning Signs in Narrative

Additional M-Page Information

FORM # AA-500M (12/05)

PENNDOT COPY

Crash Number: W0241130
Incident Number: 11008941



Synopsis

Print CloseWindow

Quality Assurance Synopsis (•) Report

Crash Synopsis created 10/21/2011 for Crash Number W0241130 WebGroup: REPT

Police Agency Data:

The crash report was recorded by police agency 62302-Washington City, patrol zone -100, under incident number 11008941. The dispatch date was 10/16/2011, the dispatch time was 0214 hours, the investigation date was 10/16/2011, the arrival time was 0215 hours. The investigator was MICHAEL CAIN, badge number 062. The report was approved on 10/20/2011.

Crash Data:

This is hit pedestrian crash occurred in Washington in the municipality of Washington City, on Sunday, 10/16/2011 at 0214 hours. The illumination at the time of the crash was dark with street lights. The 2 -unit crash involved 2 people with 1 injury. There were no fatalities. This is a reportable crash. Highway maintenance was not notified. The crash was not school bus related. The crash was not school zone related. The crash did not occur in a work zone. The roadway surface was dry. Weather conditions included No adverse conditions. A notification of an accident investigation was not issued. The indicated prime factor for this crash was a driver's action (the driver was distracted) for unit 01. The first and most harmful event for this crash was that unit 1 Hit unit 02.

Type Location:

This was a a four way intersection crash, which occurred at no special location.

Principal Roadway:

Washington County, JEFFERSON Avenue, the orientation of the roadway was North, there were 04 travel lane(s), the speed limit was 25 Mph, with a local road or street route signing.

Intersecting Road:

Washington County, CHESTNUT Street, the orientation of the roadway was West, there were 02 travel lane(s), the speed limit was 25 Mph, with a local road or street route signing.

TCD:

Traffic Control Device: a traffic signal, functioning properly.

Work zone:

Type of Work Zone: not a work zone.

Lane Closure:

Partiallyclosed. Lane closure direction North. Traffic detoured yes. Estimated hours closed 30 - 60 minutes.

UNIT INFORMATION: 1

Unit Number 1 was a motor vehicle in transport. The unit was owned by RISBIN, JAMES. Address: 740 MICHIGAN AVE APT WASHINGTON PA 15301. This 2010 KIA identified by VIN: KNDJT2A25A7039358 was registered in PA with License FWH7382. Travel speed: Unknown. Unit insured: vehicle has insurance, Insurance Company: TRAVCO INSURANCE. The Unit was towed by ISMINGERS. This was not a commercial vehicle. This Unit was an SUV, Vehicle color: Brown, Special Usage: Not applicable. The initial impact point was at 1 o'clock, Damage Indicator: Minor (able to be driven), Vehicle role: Hit unit 02. Vehicle position: in the curb lane right. Direction of travel: North, Movement: Going straight, Gradient: on a level roadway, Alignment: Straight.

Driver Information:

The driver of this unit was JAMES M RISBIN. Address: 740 MICHIGAN AVE APT WASHINGTON PA 15301. Drivers License #: 18344858, State: PA. DOB: ( [redacted] Age: 53. Sex: Male. Seat position: driver's seat. Primary safety equipment: lap and shoulder belt were used. Secondary safety equipment: None used / Not applicable. Injury severity: Not injured. Ejection: Not applicable. Alcohol/Drugs Suspected: Alcohol, Alcohol Test Type: a blood, Alcohol Test Results: Result = 0.99. Driver's action(s), 1 the driver was distracted. The individual's

condition had been drinking. Vehicle code 3802 was violated. .

UNIT INFORMATION: 2

Unit Number 2 was a pedestrian.

Pedestrian Information:

JERRY RAY. Address: 133 WABASH ST. PITTSBURGH PA 15220. DOB: [redacted] Age: 46. Sex: Male. Primary safety equipment: None used / Not applicable. Secondary safety equipment: None used / Not applicable. Injury severity: Major injury. Alcohol/Drugs Suspected: Alcohol, Alcohol Test Type: Test not given, Alcohol Test Results: Result = 0.00. The individual's condition had been drinking. The pedestrian's action was Other. The pedestrian's clothing was Dark.

Print CloseWindow