**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JERRY L. RAY,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | 2:13cv1483 |
| ) | **Electronic Filing** |
| ) | |
| **MICHAEL CAIN,** an Individual, ) | |
| **JAMES MARKLEY,** an Individual, ) | |
| and **CITY OF WASHINGTON,** ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION</u>

September 29, 2016

This civil rights action was filed by plaintiff Jerry L. Ray ("Ray") against the City of

Washington, Pennsylvania (the "City") and two of its police officers, Michael Cain ("Cain") and

James Markley ("Markley"). The lawsuit arises from an incident in which Ray was struck by a

moving vehicle after being arrested for public intoxication and handcuffed by the officers while

lying in the middle of a city street. Ray's Amended Complaint asserts Section 1983 claims

against the defendants based on the alleged violations of his Fourth and Fourteenth Amendment

rights. In addition, the Amended Complaint asserts claims against Cain and Markley for alleged

battery. This court has subject matter jurisdiction over the dispute pursuant to 28 U.S.C. §§ 1331

and 1367.

Presently pending before the court is the defendants' motion for summary judgment

relative to all claims in the Amended Complaint. For the reasons set forth below, defendants'

motion will be granted in part and denied in part.

1

## I. Background

In the early morning hours of October 16, 2011, Markley and Cain were working a shift from midnight to 8:00 a.m. patrolling the City of Washington in uniform and in a marked vehicle. (DCSMF ¶1.)[1]  At some point between 2:00 and 2:14 a.m., they were proceeding in their cruiser eastbound on West Chestnut Street and were stopped behind two vehicles at a traffic light at the intersection of West Chestnut and Jefferson Avenue, a major intersection within the City of Washington. (DCSMF ¶2; PCSMF ¶¶ 40-41.)[2]  On either side of West Chestnut Street, Jefferson Avenue has two lanes of travel for northbound traffic as well as two lanes of travel for southbound traffic. (Pl. Ex. 15, ECF No. 102-5.)

As they approached the intersection in question, Markley and Cain observed at least one of the vehicles in front of them turn right from West Chestnut onto Jefferson and swerve to avoid hitting something in the southbound lane of Jefferson Avenue. (DCSMF ¶3; PCSMF ¶¶ 41-42.) Markley and Cain then observed an adult individual, later identified as Ray, lying in the southwest corner of the intersection.[3]  (DCSMF ¶4; *see also* Amended Compl. ¶13, ECF No. 30.)

---

[1] Citations to "DCSMF¶ ___" refer to Defendants' Concise Statement Material Facts (ECF No. 50) and plaintiff's responses thereto (ECF No. 100).  Except as otherwise noted, the court does not deem the cited facts to be genuinely disputed.

[2] Citations to "PCSMF ¶___" refer to Plaintiff's Concise Statement of [Material] Facts (ECF No. 101) and defendants' responses thereto (ECF No. 109).  Except as otherwise noted, the court does not deem the cited facts to be genuinely disputed.

[3] In his brief in opposition to the pending motion, Ray contends that whether he was found lying in the street is a genuinely disputed issue.  Upon consideration of the parties' arguments in this regard, the court does not agree.  The officers' testimony that Ray was discovered lying in the southwest portion of the intersection is mutually corroborative and consistent with their contemporaneous reports.  The officers' account is also consistent with Ray's vague testimony, cited herein, that he was walking along the street and "then ...went boom." (Ray Dep. at 14:3-5, ECF No. 57.)  Moreover, as Ray acknowledges, he affirmatively pled in his Amended Complaint

The officers parked their cruiser at the southwest corner of Jefferson and West Chestnut, activated their emergency lights, and exited the vehicle. (DCSMF ¶11; PCSMF ¶43.)

Previously that night, Ray had been at a bar in the City and had consumed alcoholic beverages. (DCSMF ¶6; PCSMF ¶32.) He claims that he consumed one or two Captain Morgan rum drinks and one beer. (DCSMF ¶6.) While at the bar, Ray received a phone call; he then left the bar alone to meet the caller in the parking lot of a Walgreens store that was located at the intersection of West Chestnut Street and Jefferson Avenue. (DCSMF ¶¶ 7, 9; PCSMF ¶33.) He denies having any trouble walking as a result of consuming alcohol. (Ray Dep. at 17:11-16, ECF No. 57.)

Ray has no recollection of the timeline of events that occurred thereafter and that form the basis of this lawsuit. (DCSMF ¶5; PCSMF ¶34.) He recalls walking along West Chestnut Street towards Walgreens and states that he then "went, 'boom.'" (Ray Dep. at 14:3-5, ECF No. 57.) His next memory is waking up in the hospital. (Id. at 16:2-6, 19:2-6.) He cannot recall whom he was going to meet or whom specifically he spoke with at the bar -- only that it was "some chick." (DCSMF ¶10.)

---

that he was "lying prone on Jefferson Avenue in the right-hand lane of travel at or near it's [sic] intersect with the east bound lanes of Chestnut Street." (Amend. Compl. ¶13, ECF No. 29.) Ray's pleading in this regard constitutes a binding judicial admission. *See Thompson v. Howard*, No. CIV.A. 9-1416, 2015 WL 5039395, at *8 (W.D. Pa. Aug. 26, 2015) ("A fact asserted in a pleading, which is both unequivocal and which would normally require evidentiary proof, constitutes a judicial admission.") (citing *Judon v. Travelerers Property Cas. Co.*, 773 F.3d 495, 502 n. 6 (3d Cir. 2014)). Ray indicates in his brief in opposition to the pending motion that he "will seek Amendment prior to trial to conform the pleadings to the facts," (Pl.'s Br. Opp. at 18 n.3, ECF No. 99); however, the deadline for amending pleadings is long past, and Ray has provided no explanation for his previous failure to seek leave to amend. At this late date, given the procedural posture of this case, the court is not inclined to allow further amendment. *See Bonilla v. City of York, Pennsylvania*, No. 1:14-CV-2238, 2016 WL 3165619, at *4 (M.D. Pa. June 7, 2016) (noting that motions to amend, when filed after a summary judgment motion has been submitted, are highly disfavored). The court will therefore treat the officers' assertion that Ray was discovered lying in the roadway as a conclusively established fact.

It is undisputed that the officers' interaction with Ray, after they discovered him lying in the street, culminated in an arrest for public intoxication, pursuant to which Ray was handcuffed and detained in a different portion of the intersection. It is further undisputed that, while handcuffed in the roadway, Ray was struck by a drunk driver and severely injured. Ray has no memory of what happened in the interim, and the only eye witness accounts are those of Cain, Markley, and James Risbin, the driver who struck him.

Markley testified that, when he first approached the area where Ray was lying, Ray did not appear to be conscious. (Markley Dep. at 67:7-10, ECF No. 102-5.) Markley made physical contact with Ray by either kicking Ray's shoe or poking and shaking him. (Id. at 68:6-12.) As Ray began to raise himself from the ground, Markley instructed Ray to get off the roadway and "go to the sidewalk." (Id. at 68:18-70:2.) Markley states that, at this point, he was standing between Ray and the sidewalk near Walgreens, just a few feet away. (Id. at 69:5-9, 70:1-5.) Despite Markley's verbal instructions, Ray hurriedly staggered off toward the opposite end of the intersection. (Markley Dep. at 70:15-71:4, 75:4-25, 79:18-22.) Markley claims that Ray seemed intoxicated because he was mumbling and staggering across the intersection. (Id. at 70:24-71:5.)

Cain corroborated the fact that the officers approached Ray and made some sort of contact with him. (Cain Dep. at 42:14-45:11, ECF No. 102-3.) Cain also testified that Ray was not initially responsive but, as soon as he saw the officers, he stood up and immediately started walking in the opposite direction toward the northeast corner of the intersection. (Id. 44:12-14, 47:4-11, 48:6-16.) Cain formed the impression that Ray was intoxicated because Ray appeared to be disoriented and confused. (Id. at 43:22-44:7, 49:24-50:4.)

Markley and Cain both testified that, as they pursued Ray through the intersection, they issued repeated verbal commands to return to the sidewalk or stop walking away, but Ray failed

to comply and continued on to the other side of the intersection.  (Markley Dep. at 76:21-25, 90:24-25; Cain Dep. at 51:1-52:12.)  Neither officer was able to see Ray's hands during this time, because his hands were not at his side.  (Markley Dep. at 86:6-10; Cain Dep. at 53:6-10, 54:6-22.)  Markley claims that he perceived Ray was reaching for something and, concerned that Ray might have been reaching for a weapon, he drew his taser[4] for protection as the officers followed Ray from behind.  (Markley Dep. at 87:17-88:20.)

Both officers contend that, once Ray reached the northeast corner of the intersection, he came into contact with a traffic light pole and fell into the northbound portion of Jefferson Avenue; however, their accounts differ somewhat.  Markley testified that, after ordering Ray to the ground, Ray appeared as though he was trying to sit down, but he fell backward into the pole and then bounded forward and rolled into the street.  (Markley Dep. at 90:24-93:24.)  Cain recalled that Ray simply walked head-on into the pole and then staggered backward and fell into the street.  (Cain Dep. at 55:3-56:14.)

---

[4] Ray disputes that Markley ever drew his taser.  He claims this asserted fact is not credible because (a) Markley admitted he would never draw his taser as a defense to someone with a gun, (b) doing so would violate department policy and, (c) Cain does not specifically recall Markley drawing his taser.  To the extent this issue is material, the court is not persuaded that a genuine issue of fact exists.  Markley provided unrebutted testimony that he drew (but did not use) his taser because was concerned Ray might have some type of weapon on his person, including, possibly, a gun; however, he could not be sure what, if anything, Ray might be reaching for because Ray's back was to the officers as he crossed the intersection and his hands were not visible. (Markley Dep. at 86:2-88:25.)  Although Cain could not specifically recall Markley drawing his taser, he agreed that Markley may have done so and it would not have been an unusual action under the circumstances.  (Cain Dep. at 122:6-20.)  Although using a taser in defense of a firearm would contravene department policy, Markley testified that he did not draw his handgun because he did not want to shoot Ray and did not know what type of weapon, if any, Ray might be carrying.  (Markley Dep. at 88:2-20.)  Markley's decision to draw his taser, as opposed to his firearm, in such a situation represents a reasonable and measured response to an uncertain and unfolding situation.  Under the facts of this case, his decision to draw his taser rather than a gun is not so contrary to common sense as to render Markley's account incredible.

Once Ray landed in the street, Markley and Cain immediately handcuffed him and placed him under arrest for public intoxication. (DCSMF ¶25.) The officers maintain that they handcuffed Ray out of concerns for their own safety as well as his, and because Ray had been noncompliant with their directives. (Id. ¶26.) Markley contends that, as he grabbed Ray to apply the handcuffs, Ray dropped a cellphone that he had been trying to use. (Markley Dep. at 95:17-97:12.) There is no dispute that a cellphone was retrieved from Ray incident to his arrest. (DCSMF ¶27.)

Prior to placing Ray into custody, the officers had twice attempted to call 911 but were unable to make contact with the dispatcher. (PCSMF ¶132.) After placing Ray in handcuffs, the officers made a third call to 911 and, at 2:14:51 a.m., they were able to notify the dispatcher of their status with an intoxicated person at the subject intersection. (DCSMF ¶28; PCSMF ¶133.)

During the course of Ray's arrest, Cain used his department-issued flashlight in the strobe setting to warn possible oncoming traffic that Ray and Markley were in the roadway. (DCSMF ¶¶ 29-30; PCSMF ¶¶143-147; Cain Dep. 63:1-67:6; Markley Dep. 108:16-18; *see also* ECF No. 102-5, pp. 16, 18, 38.) Once Ray was handcuffed, Cain -- observing no vehicles in the immediate vicinity -- left Markley and Ray to retrieve the police cruiser from across the intersection. (DCSMF ¶¶31-33; PCSMF ¶149.) Cain's stated intent was to reposition the cruiser so as to block the area where Ray was lying and to bring the vehicle closer to Ray so that the officers could get him off the road and into the police car faster. (DCSMF ¶33; PCSMF ¶148.)

Meanwhile, Markley remained with Ray and instructed Ray to pull his knee to his chest so that Markley could help Ray get to his feet and out of the roadway. (DCSMF ¶34.) As Markley was doing so, a vehicle driven by James Risbin was approaching from the south, proceeding northbound on Jefferson Ave. (Id. ¶¶ 35, 38.) Defendants maintain that, during this

time, Markley's flashlight was activated and he was holding it on the roadway to provide a warning; however, this fact is disputed. (Id. ¶29, 36.)

As Risbin's vehicle continued to approach the area in question, Markley – seeing the approaching headlights -- attempted to pull Ray out of the roadway, but could not do so because of Ray's size.[5] (Id. ¶37.) Just prior to impact, Markley dove out of the vehicle's path, leaving Ray in the roadway where he was struck by Risbin's vehicle. (Id. ¶¶ 39-40.)

After checking on Ray, Markley placed another call to 911 at 2:17:26 a.m. to summon an ambulance and a life flight helicopter. (DCSMF ¶41.) Cain moved the police cruiser to the area of the accident in order to block the northbound traffic on Jefferson Avenue. (Id. ¶42.)

Cain then spoke with Risbin and learned that Risbin had just come from a club where he had been consuming alcohol. (DCSMF ¶48.) Risbin was given a field sobriety test and then taken for a blood draw, which later revealed a blood alcohol content of .154 %. (DCSMF ¶¶ 50-51.)

Risbin told Cain that, as he had been approaching the scene of the accident, he was distracted by red and blue cruiser lights and did not see Markley or Ray in the roadway ahead of him. (DCSMF ¶49; *see also* Cain Dep. at 165:9-13, ECF No. 53; Pl.'s Ex. 19 at p. 1, ECF No. 102-5.)[6] Risbin stated that, because of the cruiser lights, he was looking to the left and right for a

---

[5] At the time in question, Markley was 5'11" and weighed approximately 170 pounds and Cain was 5'9" and approximately 185-190 pounds. (DCSMF ¶¶ 64-65.) Ray was 5'11" and approximately 265 to 300 pounds. (Id. ¶66.)

[6] In his deposition, Risbin elaborated and stated that he had actually observed two police cruisers parked on either side of Chestnut Street with their red and blue emergency lights activated. (Risbin Dep. at 27:11-14, 28:10-16, 29:12-15, 73:1-25, ECF No. 102-6.) Assuming Risbin's account is credited, it appears to be Ray's position that the second cruiser was occupied by Sergeant Michael Sulerud. (*See* PCSMF ¶¶182-185.) There is no evidence to suggest that Sergeant Sulerud was materially involved in the events giving rise to this action, and he

stopped vehicle or accident as he proceeded along Jefferson Avenue. (Risbin Dep. at 31:24-32:24, 71:11-25, 73:11-18.) He denies seeing any flashlights illuminating the presence of Ray or Markley on the roadway prior to impact. (Risbin Dep. at 30:17-31:15, 72:1-4, ECF No. 102-6.) Risbin was ultimately charged with DUI, high rate of alcohol, 75 Pa. C.S. §3802(b). (DCSMF ¶62.)

Following the accident, Ray was attended to by paramedics at the scene and was subsequently flown by helicopter to UPMC Presbyterian Hospital. (DCSMF ¶43.) Both the paramedic in the ambulance and the paramedic on the flight crew indicated that plaintiff smelled of alcohol. (Id. ¶44.) A blood specimen drawn at 4:00 a.m. later revealed that Ray had a serum alcohol concentration of 126 mg/dl. (Id. ¶58.)

As a result of the impact with Risbin's vehicle, Ray sustained serious injuries. He was never ultimately charged with a crime. (Id. ¶63.)

Ray filed this lawsuit on October 11, 2013 (ECF No. 1). His Amended Complaint -- the operative pleading in this case – sets forth seven causes of action. In Counts I and IV, he asserts claims against Cain and Markley, respectively, based on the alleged violation of his substantive due process rights. In Counts II and V, Ray asserts claims against Cain and Markley, respectively, for the alleged use of excessive force. In Counts III and VI, Ray asserts state law claims of battery against Cain and Markley, respectively. Finally, in Count VII, he asserts a §1983 claim against the City of Washington based on a "failure to train" theory. Defendants' pending motion seeks summary judgment as to every count in the Amended Complaint.

---

expressly denies being on scene prior to the crash. (PCSMF ¶185.) Accordingly, the court views this factual dispute, if any, as immaterial.

## II. Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegation or denials," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonvmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the

nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## III. Discussion

### A. Plaintiff's Section 1983 Claims

In Counts I, II, IV and V of the Amended Complaint, Ray asserts claims against Cain and Markley in their personal capacities for the alleged violation of his federal constitutional rights. Ray's claims are asserted under 42 U.S.C. §1983, which affords private citizens a statutory right to seek redress for violations of federal law committed by state individuals. *See Woodyard v. Cnty. of Essex*, 514 F. App'x 177, 180 (3d Cir. 2013). To assert a claim under the statute, a plaintiff must demonstrate that he was deprived of a federal constitutional or statutory right by a person who was acting under the color of state law at the time that the alleged deprivation occurred. *Id*. Because there is no dispute that the defendant officers were acting color of state law, the critical issue is whether Ray has established a violation of his federal constitutional rights. Here, Ray alleges that the officers violated the Fourth Amendment's proscription against unreasonable seizures as well as the Fourteenth Amendment's guarantee of due process.

### 1. Preliminary Issues Regarding Plaintiff's Experts

Before turning to Ray's constitutional tort theories, the court must address a preliminary issue – namely, the extent to which the court will consider evidence proffered by two of plaintiffs' experts in connection with its Rule 56 analysis. Included within Ray's appendix of exhibits are reports from Charles W. Drago, an expert in police practices (Pl.'s Ex. 3, ECF No. 102-1), and Michael J. McCabe, Jr., Ph.D., a toxicologist (Pl.'s Ex. 20, ECF No. 102-5). Defendants have opposed any consideration of these reports partly on the grounds that they were

unsworn when submitted, but that particular defect has apparently been cured by Ray's subsequent submission of affidavits from each expert. (See ECF Nos. 114 and 115).

More relevant is the defendants' substantive challenges to these reports. In particular, the court must assess whether the reports contain admissible information and the extent to which they support the existence of material issues of fact.

### a.) Charles W. Drago

Ray has submitted the August 20, 2015 report of Charles W. Drago as evidence concerning proper police practices in the use of force, arrest techniques, traffic incident management, training, supervision, and police policies. (Pl.'s Ex. 3, Drago Report at 3, ECF No. 102-1.) In his report, Mr. Drago proffers a number of opinions and conclusions concerning the actions of Markley and Ray. Defendants argue that Mr. Drago's report should be disregarded because it contains inadmissible conclusions and legal opinions. The court agrees that much of the report's content is either irrelevant or inadmissible for summary judgment purposes.

We begin by observing that the admissibility of expert testimony is governed by Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 588-89 (1993). The rule requires that an expert witness be qualified through "knowledge, skill, experience, training, or education," and provides that an expert may give opinion testimony if: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand evidence or determine a fact in issue; (2) the testimony is based upon sufficient facts or data; (3) the testimony is the product of reliable principles or methods; and (4) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. A trial court must act as a gatekeeper "to ensure that 'any and all expert testimony or evidence is not

only relevant, but also reliable.'" *Pineda v. Ford. Motor Co*., 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 806 (3d Cir. 1997)).

Having reviewed Mr. Drago's report, the court agrees with defendants that substantial portions of the report violate the strictures of Rule 702. As set forth persuasively in defendants' reply brief, Mr. Drago's report is rife with speculation and conjecture as well as legal opinions that are not within the scope of proper expert testimony. (See generally Def.s' Reply Br. at 1-3, ECF No. 108.)

Notably, as it relates to Ray's excessive force claim, Mr. Drago's report contains citations to applicable legal standards and concludes that the officers' use of force was objectively unreasonable. (*See* Drago Report, Part C.) Because this opinion is essentially a legal conclusion that the officers violated the Fourth Amendment proscription against unreasonable seizures, it is not proper under the Federal Rules of Evidence. *See Bonilla v. City of York, Pennsylvania,* No. 1:14-CV-2238, 2016 WL 3165619, at *8 (M.D. Pa. June 7, 2016) (expert could not testify as to whether the officers' actions constituted excessive force as that is defined in relation to a Section 1983 claim for violation of Fourth Amendment rights because, "[w]hile Rule 704 allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards.") (quoting *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013)); *Smith v. New Jersey,* Civil Action No. 09-4268 (JBS/KMW), 2013 WL 3658786, at *5 (D.N.J. July 11, 2013) (noting that Rule 702 "does not permit the testimony of a police practices expert who is rendering opinions about whether particular conduct violated the relevant constitutional provisions."). Furthermore, to the extent Mr. Drago's criticisms of the officers' conduct in effectuating Ray's arrest amounts to an

evaluation of reasonableness with "20/20 hindsight," such analysis is inappropriate. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Similarly, the court will not blindly credit Mr. Drago's conclusion that the officers "created a dangerous situation" by "caus[ing] Jerry Ray to walk into traffic and then fail[ing] to protect him." (Drago report, Part B, p. 5.) To the extent these types of consideration are relevant to Ray's state-created danger theory, the legality of the officers' conduct must be judged against the relevant constitutional standards, not by Mr. Drago's professional opinions. The controlling jurisprudence involves consideration of factors such as whether, *e.g.,* the officers acted in a sufficiently affirmative manner in creating the alleged danger. *See L.R. v. Sch. Dist. of Philadelphia*, No. 14-4640, 2016 WL 4608133, at *3 (3d Cir. Sept. 6, 2016). Mr. Drago's personal, conclusory opinions in this regard are both irrelevant and unhelpful to the court's assessment of Ray's Fourteenth Amendment claim.

Other portions of Mr. Drago's report are simply immaterial to the court's resolution of the pending motion. For example, Mr. Drago criticizes the manner in which the officers originally positioned their cruiser when they first spotted Ray in the southwest corner of the intersection. (Drago Report, Part A.) Ultimately, this issue is of no legal moment, because it is undisputed that Ray was not injured by any vehicles passing in the southbound lanes of Jefferson Avenue.

Elsewhere in his report, Mr. Drago purports to assess the officers' credibility, as where, e.g., he states that Markley "was unable to give a credible reason for allowing an intoxicated individual to walk away from him and into a dangerous intersection." (Drago Report, p. 6, ¶13.) Such commentary is inappropriate, as credibility assessments of a key witness are clearly the province of the factfinder and not an expert witness. *See Bhaya v. Westinghouse Elec. Corp.*,

13

832 F.2d 258, 262 (3d Cir.1987) ("Evaluation of witness credibility is the exclusive function of the jury ....").

All of these defects notwithstanding, the court recognizes that expert testimony in the area of police practices and violations of professional standards may, in some contexts, constitute relevant and admissible opinion evidence. *See Bonilla,* 2016 WL 3165619, at *8 (finding expert qualified to testify regarding police use-of-force policies and whether the actions of the officers complied with those policies); *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608, at *9 (N.D. Ill. May 2, 2016) (permitting expert to testify to the relevant professional standards and identify departures from these standards, including that the City's customs or practices led to violations of generally accepted police standards and procedures); *Mutafis v. Markel*, No. 11-13345, 2013 WL 119464, at *3–*5 (E.D. Mich. Jan. 9, 2013) (distinguishing "impermissible legal conclusions" offered by experts from testimony regarding "prevailing standards in law enforcement" or "discrete police-practice issues," which is generally admissible).

Certain aspects of Mr. Drago's report set forth appropriate subject matter on the topic of police practices. For example, Mr. Drago opines that secondary collisions (i.e., those that occur as a result of a roadway obstruction or distraction) should be a major concern for trained police officers, especially at a busy intersection like the one involved in this case. (Drago Report, p. 9, ¶32.) Mr. Drago also opines that "[i]t would be very difficult and sometimes impossible for an individual to move or stand up while his hands are handcuffed behind him." (Id. at ¶35.) These types of opinions are properly within the area of Mr. Drago's specialized knowledge and, moreover, they are potentially relevant to the court's analysis of Ray's constitutional claims. Accordingly, the court will give due consideration to those aspects of Mr. Drago's report that

constitute admissible opinions on police practices, to the extent such opinions are relevant to the court's evaluation of Ray's constitutional claims.

### b. Michael J. McCabe, Jr. Ph.D.

Ray has also submitted a report from Dr. Michael J. McCabe, Jr., a toxicologist (Pl.'s Ex. 20, ECF No. 102-5). As set forth in the report, Dr. McCabe was retained to determine, in part, whether Ray's level of intoxication (meaning his blood alcohol concentration, or "BAC") was consistent with and predictive of outward signs of intoxication as described by Markley and Cain. (McCabe Report, p. 1.) Based on a blood draw that was taken at the hospital following the incident in question, Ray's serum alcohol concentration was found to be 126 mg/dl. (Id. at p. 2.) Dr. McCabe discusses the principles of absorption, distribution, metabolism and elimination, as they relate to the concentration of alcohol in a person's bloodstream. Based on Ray's serum alcohol concentration, as measured in the sample of blood drawn at 4:00 a.m. on October 16, 2011, Dr. McCabe opines that Ray's BAC at or around the time of the incident was 0.141%, and, under a more conservative analysis, it was 0.132%. (Id. at pp, 3-4, and 7, ¶2.) Dr. McCabe also discusses the relationship between a person's BAC and his or her level of functional impairment. He opines that "the BAC threshold where Ray would be expected to exhibit visible or outward signs of intoxication was certainly ≥ 0.15% and probably closer to 0.20%." (Id. at p. 6, and 7, ¶3.) From this, Dr. McCabe concludes that "Ray's blood alcohol concentration was not consistent with or predictive of outward signs of intoxication as described by the police." (Id. at p. 7, ¶3)

Although defendants generally object to Dr. McCabe's report as speculative, they have not directly joined issue with his opinion that Ray's alleged manifestations of intoxication, such as staggering, are statistically inconsistent with the concentration of alcohol in his blood. If

credited, Dr. McCabe's opinion tends to contradict the officers' testimony that Ray was visibly intoxicated and staggering across the intersection. The procedural posture of this case is such that Dr. McCabe has not been deposed, nor does the court have before it a *Daubert* motion or motion in limine that properly frames the admissibility of Dr. McCabe's testimony. Without the benefit of a more complete record including -- at the very least -- further briefing, the court is not in a position to make any definitive rulings on the admissibility of Dr. McCabe's testimony. Although the state of the evidentiary record could certainly change at point prior to or during trial, for present purposes the court will accept Dr. McCabe's report and conclusions and consider them in connection with the defendants' pending motion.

### 2. Plaintiffs' Excessive Force Claims

In Counts II and V of the complaint, Ray alleges that his Fourth Amendment rights were violated due to the officers' use of excessive force. For purposes of this case, there is no dispute that the officers' detention of Ray constituted a seizure, and their application of handcuffs constituted a use of force. Thus, the question becomes whether the officers' use of force was excessive. To make that determination, the officer's actions must be analyzed under an "objectively reasonable" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

"The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (internal quotation marks omitted). "Thus, if a use of force is objectively unreasonable, an officer's good faith is irrelevant; likewise, if a use of force is objectively reasonable, any bad faith motivation on the officer's part is immaterial." *Estate of Smith*, 318 F.3d at 515 (citing

16

*Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999)).  Factors that a court should consider in determining whether the force was objectively reasonable are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Graham*, 490 U.S. at 396).  Additional factors to consider are "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec*, 361 F.3d at 777 (citation omitted).  As the Third Circuit has explained:

> An excessive force claim must be evaluated 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and 'must embody the allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are often tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'

*Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (quoting Graham, 490 U.S. at 396-97).

Defendants maintain that Ray was properly handcuffed based on considerations of his own safety, the safety of the officers, the fact that he had previously not complied with the officers' directives, and the fact that he was visibly intoxicated.  Defendants maintain that, under the totality of circumstances, their use of force was objectively reasonable; alternatively, they seek protection under the doctrine of qualified immunity.  Ray maintains that, under the circumstances of this case, his being handcuffed and detained in the roadway of a major intersection for a period of approximately two and one-half minutes was patently unreasonable.

Determining whether the use of force is reasonable is largely a fact specific inquiry.  See Reiff v. Marks, No. 08-CV-5963, 2011 WL 666139, at *5 (E.D. Pa. Feb. 23, 2011).  Thus, "[t]he reasonableness of the use of force is normally an issue for the jury."  Rivas, 365 F.3d at 198 (citation omitted).  Here, the record gives rise to a genuinely disputed question concerning the

objective reasonableness of the officers' conduct in handcuffing Ray in the roadway of a major intersection. As Ray points out, the crime at issue –public intoxication – was not severe, and the officers' decision to arrest was entirely discretionary. Although Markley claims to have witnessed furtive movements and was concerned that Ray might be carrying a weapon, Ray was in fact unarmed, and he never posed an overt or imminent threat to the officers' safety. Ray was not acting violently, nor did he verbally threaten the officers in any way. Although Markley and Cain both perceived that Ray was attempting to evade them as he crossed the intersection, a jury could infer that, once he reached the other side of the intersection, he attempted to comply with Markley's directions to get down on the ground when he struck the light post and fell back into the street. A jury could also infer that, despite Ray's initial efforts to avoid interaction with the officers, he did not actively resist arrest. There were no other major disturbances or distractions going on at the time, nor were there other individuals with whom the officers had to contend. Viewing all of these considerations in the light most favorable to Ray, a jury could find that the officers' application of handcuffs in the roadway was objectively unreasonable.

Moreover, the officers' decision to apply handcuffs to Ray was materially driven by his alleged state of intoxication – a factor that bears on the extent to which Ray posed a danger to himself or others. For present purposes, Ray has raised a genuine dispute as to that material fact through the report of Dr. McCabe which, as noted, concludes that Ray's BAC at the time of the incident is inconsistent with, and not predictive of, the types of outward manifestations of intoxication that Markey and Cain claim to have observed. (Pl.'s Ex. 20 at p. 7, ECF No. 102-5.) Ray has therefore adduced sufficient evidence of a constitutional violation in support of his §1983 claims at Counts II and V of the Amended Complaint.

Defendants maintain that, even if the officers' use of force was objectively unreasonable, they are entitled to qualified immunity. An officer is entitled to qualified immunity when he makes a reasonable mistake as to what the law requires of him in a particular situation, *Saucier v. Katz*, 533 U.S. 194, 205 (2001), and will be denied qualified immunity only where he has violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). In determining whether to grant qualified immunity, the court must determine (1) if the plaintiff has alleged sufficient facts to make out a violation of a constitutional right and (2) whether that right was clearly established. Saucier, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202.

In this case, the disputed issue as to whether, and to what extent, Ray manifested signs of intoxication precludes an award of qualified immunity. See Curley v. Klem, 499 F.3d 199, 278 (3d Cir. 2007) (recognizing that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis"); Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury."); *Garey v. Borough of Quakertown,* Civil Action No. 12-0799, 2013 WL 3305222, at *5 (E.D. Pa. July 1, 2013) ("The Court declines to grant Defendants summary judgment under the qualified immunity doctrine for the same reason it declined to grant them summary judgment on the merits – there are material factual disputes about Plaintiff's behavior precipitating the first and second tasings, and Defendants' responses to that behavior,

such that the objective reasonableness of Defendants' conduct cannot be determined from the summary judgment record alone.").

For these reasons, defendants' motion for summary judgment will be denied as to Counts II and V of the Amended Complaint.

### 3. Substantive Due Process

In Counts I and IV of the Amended Complaint, Ray asserts claims against Cain and Markley, respectively, for the alleged violation of his substantive due process rights under a "state-created danger" theory. In this case, it is undisputed that the immediate cause of Ray's injuries came from Risbin's vehicle striking him. For due process purposes, it is generally recognized that the Fourteenth Amendment does not confer an affirmative right to governmental aid and/or protection from private sources of harm. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 195 (1989) ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.").

An exception to this general rule exists, however, under the "state created danger" theory. To establish a claim under this theory, a plaintiff must demonstrate the following elements:

1. the harm ultimately caused was foreseeable and fairly direct;

2. a state actor acted with a degree of culpability that shocks the conscience;

3. a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

4. a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*L.R. v. School Dist. of Phila.,* --- F.3d ---, 2016 WL 4608133, at *3 (3d Cir. Sept. 6, 2016);

*Bright v. Westmoreland Cty.,* 443 F.3d 276, 281 (3d Cir. 2006).

Based on this record, the court does not perceive any genuine dispute that the first and third elements of the state-created danger test are met. The record establishes that the intersection in question is one of the larger intersections in the City of Washington and, by one officer's account, the largest. (See PCSMF ¶40.) The possibility of traffic passing through the intersection, even at 2:15 a.m. in the morning, was foreseeable and fairly direct. Further, Ray's status as an individual who was detained and arrested by the officers made him a foreseeable victim of any harm that occurred at their hands.

Any deficiencies in Ray's substantive due process claim generally involve the second and fourth elements of the state-created danger test, *i.e.,* whether Markley and Cain engaged in affirmative acts that created or increased the risk of danger to Ray and, if so, whether their actions acts "shock the conscience." The court will analyze these elements together.

Recognizing that it is often difficult to distinguish between "action" and "inaction" on the part of a defendant, the Third Circuit Court of Appeals has found it "useful" to "first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo." *L.R.,* 2016 WL 4608133, at *4. Applying that standard, the court concludes that, during the course of their interaction with Ray, Markley and Cain affirmatively used their authority in a number of ways that altered the "status quo"; however, none of these actions can give rise to liability under a state-created-danger theory because, in each case, either the action did not materially increase Ray's risk of harm or, to the extent it did, the officers' conduct was not "conscience-shocking."

For example, a factfinder could conclude that the officers affirmatively altered the status quo when they parked their vehicle at the southwest corner of the intersection and activated their cruiser lights. Relying on the opinion of Mr. Drago, Ray appears to suggest that the officers failed to properly position their cruiser so as to block traffic in the southbound lanes of Jefferson Avenue. However, Ray was not injured while in the southwest corner of the intersection, so the officers' failure to block oncoming traffic in the southbound lanes is of no legal moment from a causation standpoint. Moreover, the evidence shows that the cruiser was parked in such a manner that it would have prevented eastbound vehicles on West Chestnut Street from making an otherwise blind, right-hand turn onto Jefferson Avenue in the area where Ray was first discovered. (DCSMF ¶12; PCSMF ¶47; Cain Dep.a t 74:10-75:8.) In this important respect, the officers' actions actually helped to protect Ray while he briefly remained in the southwest corner of the intersection.

Ray nevertheless suggests that the positioning of the cruiser ultimately increased his risk of harm by distracting Risbin when he later passed through the northeast portion of the intersection; but even if this is true, that harm was not sufficiently direct and foreseeable to the officers as of the time they initially parked their vehicle and first confronted Ray. Nor could a jury reasonably conclude that the officers, in parking their cruiser as they did, acted with the requisite degree of culpability. To show "conscience-shocking" conduct in the context of this case – where critical events unfolded over the course of mere minutes, Ray has to demonstrate, at the very least, that the officers "consciously disregarded" a "great risk" that he would be harmed. *See Sanford v. Stiles,* 456 F.3d 298, 310 (3d Cir. 2006).[7] No reasonable jury could conclude that

---

[7] The parties disagree as to the level of culpability necessary to demonstrate "conscience-shocking" behavior in the context of this case. Determination of the appropriate level of culpability generally depends on the extent to which deliberation is possible. *See Sanford v.*

the officers consciously disregarded a great risk of harm by parking their cruiser and activating

their emergency lights in response to seeing a man lying in the roadway.

The officers also acted affirmatively when they initially approached Ray and ordered him

to get to the sidewalk.  Again, however, this action does not satisfy the elements of a state-

created danger.  Ray (through the report of Mr. Drago) appears to fault the officers for giving

unclear instructions, which supposedly prompted Ray to walk toward the sidewalk at the

opposite end of the intersection, through multiple lanes of traffic, but this interpretation of the

evidence is untenable.  Even construing the evidence most favorably to Ray, the only reasonable

interpretation of the facts is that Markley attempted to summon Ray to the sidewalk, which was

just a few feet away; Ray, however, proceeded in the opposite direction of his own volition (or

perhaps because he was confused).  No reasonably jury could conclude that Markley and Cain

---

*Stiles,* 456 F.3d 298, 310 (3d Cir. 2006); *Phillips v. Cty. of Allegheny,* 515 F.3d 224 (3d Cir.
2008). The highest degree of culpability – intent to harm -- is reserved for situations where the
defendant was faced with a "'hyperpressurized environment' requiring a snap judgment." *Vargas
v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015). Examples include a high speed police chase
or a prison riot. *See Cty. of Sacramento v. Lewis,* 523 U.S. 833, 853-54 (1998).  On the opposite
end of the spectrum, where deliberation is possible and officials have the time to make unhurried
judgments, deliberate indifference – defined as a "conscious[ ] disregard [of] a substantial risk of
serious harm"-- is sufficient. *Vargas,* 783 F.3d at 973 (alterations in the original)(internal
quotations marks and citations omitted).  In between these two extremes is a middle level of
culpability which applies "when a state actor is not confronted with a 'hyperpressurized
environment' but nonetheless does not have the luxury of proceeding in a deliberate fashion..."
*Sanford,* 456 F.3d at 310.  "Generally, this category will include situations in which the state
actor is required to act in a matter of hours or minutes." *Id.*(internal quotation marks and citation
omitted). In such circumstances, "the relevant question is whether the officer consciously
disregarded a great risk of harm." *Id.*

  Here, defendants argue that they were confronted with a hyperpressurized situation, such that
conscience shocking behavior can only be shown by an intent to harm.  Ray disputes this, and
argues that the mid-level standard of culpability applies. For present purposes, the court will
assume that the mid-level standard is the appropriate one.  Ultimately, however, the distinction is
immaterial because, as explained herein, the facts do not support a finding of "conscience-
shocking" behavior, even under the standard of culpability that Ray advocates.

increased the risk of harm to Ray by directing him to "go to the sidewalk," which was just a few feet away, nor could a jury infer the necessary mens rea based on this conduct.

Markley and Cain next altered the "status quo" when, according to Markley, Ray was ordered to the ground after crossing the intersection. However, Markley's testimony and report establish that Ray was not in the street at the time he was ordered to the ground; rather, Ray was on the sidewalk but bumped into a traffic light post and fell back into the street. There is no evidence of record to support a finding that the officers ordered Ray into the street, physically pushed him, or placed him there. Thus, the officers' actions in this regard did not increase the risk of harm to Ray or demonstrate a conscious disregard for his safety.

A closer question arises with respect to the officers' decision to handcuff Ray while he lay in the roadway. On this record, a jury could find that restraining Ray in this fashion involved an affirmative use of the officers' authority which rendered Ray more vulnerable to danger than he otherwise would have been. Even so, however, the evidence does not support a reasonable inference that Markley and Cain consciously disregarded the risk of harm that existed. On the contrary, the evidence shows that the officers fully appreciated the risk that oncoming traffic might harm Ray, and they clearly took steps -- albeit insufficient ones -- to mitigate that risk. While Ray was being handcuffed, Cain utilized the strobe light feature on his flashlight to warn oncoming traffic of Ray's presence in the roadway. The officers also notified 911 of their situation with an intoxicated person, which allowed backup units to be sent to the scene. After Ray was handcuffed, Cain left the area to retrieve the police cruiser that was still parked at the opposite end of the intersection. Cain's purpose for doing so was to reposition the car at the scene of the arrest so that oncoming traffic would be alerted while Cain assisted Markley in getting Ray off the roadway. (Cain Dep. at 78:11-79:10, 136:23-137:10.) Cain also wanted to

move the cruiser to a location that was closer to Ray, so that Ray would not have to be walked back to the opposite side of the intersection. While Cain departed the scene, Markley remained with Ray and gave him verbal instructions as to how to position himself so that Markley could help him off the roadway. Finally, when Markley observed Risbin's vehicle approaching, he made a last ditch effort to pull Ray from the street, but was unsuccessful. In this court's estimation, the undisputed facts of record are insufficient, as a matter of law, to support a finding that the defendant officers consciously disregarded the risk that Ray might be harmed by oncoming traffic.

To the extent that Cain's decision to leave the area of arrest and retrieve the police cruiser can be viewed as yet another affirmative use of authority that increased the risk to Ray, the evidence cannot reasonably support an inference that Cain acted with the requisite degree of culpability. Cain's unrebutted testimony is that he left to retrieve the cruiser only when he observed no traffic in vicinity. The cruiser was a relatively short distance away, and Cain's miscalculation that he could return with the vehicle before any harm occurred represents, at most, a negligent mistake of judgment rather than a conscious disregard of the potential harm that might befall Ray. Ordinary negligence, however, is insufficient to establish a substantive due process violation. *Vargas*, 783 F.3d at 974 (stating that "'[m]ere negligence is not enough to shock the conscience'") (quoting *Sanford*, 456 F.3d at 311).

In sum, Ray has failed to adduce evidence that is sufficient to establish a violation of his substantive due process rights under a state-created danger theory.[8] Accordingly, defendants'

---

[8] In his brief, Ray poses the alternative argument that his substantive due process rights were violated under a "special relationship" theory. This doctrine recognizes that, when the State takes a person into its custody and holds him there against his will, it acquires an affirmative duty to protect that person from private sources of harm. *see L.R. v. Sch. Dist. of Philadelphia*, No. 14-4640, 2016 WL 4608133, at *7 (3d Cir. Sept. 6, 2016).

motion for summary judgment will be granted relative to Counts I and IV of the Amended Complaint.

### 4. Municipal Liability

In Count 7 of the Amended Complaint, Ray asserts a claim of municipal liability against the City of Washington. A municipality may be found liable under Section 1983 for the constitutional violations of its employees "where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). A so-called *Monell* claim requires a plaintiff to "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). There can be no municipal liability under *Monell* where there is no underlying violation of a constitutional right by the individual officers. *See Kiriakidis v. Borough of Vintondale*, 609 F. App'x 713, 718 (3d Cir. 2015). Thus, insofar as the court has determined, as a matter of law, that Ray's substantive due process rights were not violated, he cannot prevail on his §1983 claim against the City. In addition, to the extent Ray had adduced evidence of a potential Fourth Amendment violation, the

---

As defendants correctly observe, Ray did not plead a separate cause of action under a "special relationship" theory and, at this late date, any attempt to amend his pleading is unwarranted on the basis of undue delay. *Bonilla v. City of York, Pennsylvania*, No. 1:14-CV-2238, 2016 WL 3165619, at *4 (M.D. Pa. June 7, 2016) (court need not grant leave to amend a pleading where there is undue delay). In any event, even if plaintiff's Amended Complaint can be read as asserting a "special relationship" theory, the claim cannot survive summary judgment. Under a "special relationship" theory of substantive due process, Ray would still have to demonstrate "conscience shocking" conduct on the part of Markley and Cain based on the same constitutional standards that apply under Ray's "state-created danger" theory. *See Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015) ("The shocks-the-conscience test applies regardless of the theory upon which the substantive due process claim is premised.") (citing cases). For the reasons previously discussed, no reasonable factfinder could conclude that Markley and Ray engaged in conduct that "shocks the conscience." Accordingly, any substantive due process claim advanced by Ray under a "special relationship" theory could not survive summary judgment.

court is compelled to grant the City's motion for summary judgment because Ray has failed to identify any municipal "policy" or "custom" that caused his injury. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. at 403.

We begin by observing that Ray's only theory as to municipal liability is that the City failed to adequately train Markley and Cain relative to the circumstances they faced in this case. Defendants point out that, in Pennsylvania, municipal police officers are required to undergo annual mandatory training delivered by the Municipal Police Officers' Education and Training Commission ("MPOETC"). *See* 37 Pa. Code §§203.13, 203.51, and 203.52. Once the courses are completed, police officers receive a certification which is renewed every two years if the officer remains in compliance with the annual training requirements. *See* 37 Pa. Code §203.13. Officers attend other trainings, as well, as determined by their chief. (DCSMF ¶75.) Here, the evidence shows that Markley and Cain were in full compliance with their MPOETC training requirements at the time of the incident. (DCSMF ¶71.)

Where the conduct at issue relates to a failure to train or supervise municipal employees, "liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Here, Ray has failed to identify any particular failure that was the moving force behind his injury or that demonstrates a deliberate indifference on the part of the City toward his rights. In his brief opposing summary judgment, Ray criticizes the fact that the police department has not been accredited by any outside agency, which he considers "important because [accreditation] requires the police department to have current written policies that are periodically revised and updated." (Pl.'s Br. Opp. Mot. Summ. J. at 24, ECF No. 99 (internal

quotation marks and citation omitted).) Ray also faults the City's police chief for utilizing the department manual as a "guide" to be enforced in accordance with the officers' "common sense" and "human compassion." (*Id*.) According to Ray, this "permitted [officers] to create their own *de facto* policies based on their judgment." (*Id*. (internal quotation marks and citation omitted).) Ray argues that senior officers within the department purposefully disregarded the manual and, as a result, non-compliant or deficient conduct was not treated as a violation of departmental policy. (Id. at 27.) As support for this theory, Ray cites Captain Robert Wilson's testimony that, in deciphering the scope of his job duties, he followed orders from the chief rather the directives in the manual. (Pl.'s Br. Opp. at 27; PCMF ¶14; Wilson Dep. at 54:1-15, 101:10-16, ECF No. 102-4.) Ray also points to testimony from Wilson that suggests the department stopped conducting annual performance reviews in the 1990s. (Pls' Br. Opp. at 27, PCSMF ¶15.)

Notably, the City has refuted Ray's assertion by providing copies of the defendant officers' many performance evaluations. (See ECF No. 110 at 10-41; ECF No. 111 at 3-30.) However, even if Ray's proffer is accepted at face value, it fails to establish a basis for municipal liability under a "failure to train" theory. To prevail at summary judgment, Ray must demonstrate "a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring). "Without some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*." *Id*. at 395. The Supreme Court has admonished that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Bd. of Cty. Comm'rs of*

*Bryan Cty. v. Brown*, 520 U.S. at 409); *see also Carswell v. Borough of Homestead*, 381 F.3d 235, 244–45 (3d Cir. 2004) (deliberate indifference "typically requires proof of a pattern of underlying constitutional violations."). This can be done by presenting evidence of similar constitutional violations by employees of which the policymaker was or should have been aware. *Id*. at 1360–61. The violations must be of sufficient similarity to impute notice of an actual pattern; mere notice of multiple violations of a constitutional right in differing ways will not suffice. *Id*. at 1360. Here, Ray has failed to adduce any evidence of prior violations similar to the type being asserted in this case; indeed, he concedes that, prior to October 16, 2011, no citizen had ever been run-over by a vehicle while in the custody of the City's police force. This is perhaps unsurprising, given the unique circumstances under which Ray came to sustain his injuries.

The Supreme Court has also held that, under very limited circumstances, a plaintiff may successfully prove a failure-to-train claim in a "single incident" case by demonstrating that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) (emphasis added). "Liability in single-incident cases depends on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223-24 (3d Cir. 2014) (internal quotations omitted). Moreover, the alleged deficiency in training must "actually cause[ ] injury." *City of Canton*, 489 U.S. at 390. "In analyzing causation, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. Liability cannot rest only on a showing that the employees could have been better trained or that

additional training was available that would have reduced the overall risk of constitutional injury. Rather, the causation inquiry focuses on whether the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014) (internal citations and quotations omitted).

Here, Ray has failed to adduce evidence sufficient to make such a showing. In addition to the proffers previously discussed, Ray criticizes the sufficiency of Cain's incident report and faults the department's senior officers for failing to conduct a sufficient post-incident evaluation of the officers' conduct. Whatever the department did or did not do following the incident in question, it is clear that those actions or inactions could not have *caused* Ray's injury. Because Ray has failed to adduce evidence sufficient to support a claim for municipal liability, the defendants' motion for summary judgment will be granted as to Count VII of the Amended Complaint.

### B.  Plaintiffs' State Law Battery Claim

Defendants also move for summary judgment on their state law battery claims as set forth in Counts III and VI of the Amended Complaint. Defendants contend that Markley and Cain are entitled to immunity, with respect to these claims, under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"). 42 Pa. Cons. Stat. Ann. §§ 8541 *et seq.* Under the PSTCA, "no local agency shall be liable for any damages on account of any injury to a person or property by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. Ann. §8541. The legislature has created statutory exceptions to this broad grant of immunity, *see id.* §8542,[9] none of which are applicable here. In addition to the statutory exceptions, employees of

---

[9] The eight exceptions to section 8541's general grant of immunity are based on negligence involving:  (1) the operation of motor vehicles; (2) the care, custody and control of personal

a local agency are not immune from liability if "the employee caused the injury and ... such act constituted a crime, actual fraud, actual malice or willful misconduct...." *Id*. §8550. For purposes of the Act, "willful misconduct" is defined as "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied...." *Bright v. Westmoreland Cty.,* 443 F.3d 276, 287 (3d Cir. 2006). Recklessness on the part of the public employee is not sufficient. *Id.*

In his brief, Ray does little more than offer the conclusory argument that willful misconduct has been demonstrated. Upon careful review of the record, the court is not persuaded that the evidence would support a finding of willful misconduct on the part of the defendant officers. Accordingly, summary judgment will be granted as to Counts 3 and 6 of the Amended Complaint.

## IV. Conclusion

For the reasons stated above, defendants' motion for summary judgment will be denied with respect to Ray's §1983 claims premised on an alleged violation of his Fourth Amendment rights, as set forth in Counts II and V of the Amended Complaint. In all other respects, defendants' motion for summary judgment will be granted.

An appropriate order follows.

---

property; (3) the care, custody, and control of real property; (4) a dangerous condition of trees, traffic controls and street lighting; (5) a dangerous condition of utility service facilities; (6) a dangerous condition of streets; (7) a dangerous condition of sidewalks; and (8) the care, custody and control of animals. See 42 Pa. Cons. Stat. Ann. §§ 8542(a) and (b)(1)-(8).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JERRY L. RAY,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) 2:13cv1483 |
| | ) **Electronic Filing** |
| | ) |
| **MICHAEL CAIN,** an Individual, | ) |
| **JAMES MARKLEY,** an Individual, | ) |
| and **CITY OF WASHINGTON,** | ) |
| | ) |
| Defendants. | ) |

## ORDER OF COURT

AND NOW, this 29th day of September, 2016, upon consideration of the Motion for Summary Judgment (**Document No. 48**) filed on behalf of Defendants, the City of Washington, Michael Cain and James Markley, Plaintiff's response thereto, the briefs and appendices filed in support thereof, pursuant to this Court's Memorandum Opinion filed herewith,

IT IS HEREBY ORDERED that the Motion Summary Judgment is granted in part and denied in part. The Motion is **GRANTED** with respect to Counts I, III, IV, VI, and VII of the Plaintiff's Amended Complaint, and **DENIED** with respect to Counts II and V of the Amended Complaint.

IT IS FURTHER ORDERED that final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure is entered in favor of Cain and Markley and against Plaintiff, Jerry L.

32

Ray with respect to Counts I, III, IV, and VI of the Amended Complaint. Judgment is entered in favor of the City of Washington and against Plaintiff with respect to Count VII of the Amended Complaint. The City of Washington is dismissed from the action.

 s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:  Gary J. Ogg, Esq.
     David K. Houck, Esq.
     Steven M. Toprani, Esq.
     John F. Cambest, Esq.
     (*Via CM/ECF Electronic Mail*)